*This opinion is subject to revision before final publication in the Pacific Reporter*

**2013 UT 56**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Plaintiff and Appellant*,
*v.*
DELFINO ARRIAGA-LUNA,
*Defendant and Appellee.*

No. 20110718
Filed August 27, 2013

Third District, Salt Lake
The Honorable Randall N. Skanchy
No. 101902755

Attorneys:

John E. Swallow, Att'y Gen., Ryan D. Tenney, Asst. Att'y Gen., Salt Lake City, for appellant

Joan C. Watt, Brenda M. Viera, Salt Lake City, for appellee

JUSTICE DURHAM authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE NEHRING, JUSTICE PARRISH, and JUSTICE LEE joined.

JUSTICE DURHAM, opinion of the Court:

### INTRODUCTION

¶1    The State appeals the district court's grant of defendant Delfino Arriaga-Luna's motion to suppress his confession to murder. The district court held that this confession was coerced because of the interrogating officers' "invocation of Mr. Arriaga-Luna's children as a method to get a confession." We reverse.

### BACKGROUND

¶2    On April 5, 2010, a female victim was found deceased in her apartment. She had two gunshot wounds to the head. As officers were investigating, Mr. Arriaga-Luna's wife arrived at the scene with the victim's boyfriend and told police that she and her two young daughters had been kidnapped by the victim's boyfriend because of a drug debt owed by her husband. The victim's boyfriend then told police he believed that Mr. Arriaga-Luna had killed his

girlfriend. Police located and apprehended Mr. Arriaga-Luna and brought him to the police station for questioning.

¶3    Mr. Arriaga-Luna was interrogated on April 6, 2010, from about one a.m. to about three a.m. The interview was conducted primarily in English, but a Spanish interpreter was present so that Mr. Arriaga-Luna could elect to hear the questions and give responses in his native language. During the interview, Detective Arenaz tried to convince Mr. Arriaga-Luna to tell him that Mr. Arriaga-Luna's brother had shot the victim, or that the killing was an accident, so that Mr. Arriaga-Luna would not go to prison for a crime he did not commit. As a persuasive technique, Detective Arenaz appealed to Mr. Arriaga-Luna's love for his children. He initiated the following exchange:

| | |
|---|---|
| Detective: | You have a wife and kids. |
| Arriaga-Luna: | Yeah. (Unintell). |
| Detective: | Do you wanna ever . . . |
| Arriaga-Luna: | (Unintell). |
| Detective: | . . . see them again? |
| Arriaga-Luna: | My babies? |
| Detective: | Yeah. |
| Arriaga-Luna: | I wanna see them. |
| Detective: | You're not gonna see them. You're . . . you're gonna be locked in prison for the rest of your life. |

Mr. Arriaga-Luna did not confess during this interview.

¶4    Two days later, Mr. Arriaga-Luna was interrogated by Detective Hamideh. Detective Hamideh appears to have employed the so-called false-friend technique. He spoke to Mr. Arriaga-Luna in Spanish, made small talk with Mr. Arriaga-Luna in the car ride before the interview about the challenges facing Latinos in the United States, and told Mr. Arriaga-Luna that he wanted to help him and his family.

¶5    During this second interview, Mr. Arriaga-Luna repeatedly expressed concern for his daughters. Detective Hamideh appealed to this concern and to Mr. Arriaga-Luna's desire for his daughters' respect and in persuading him to confess. For example, he said, "give [your daughters] hope that yes, I did what I did. . . . And I am going to take the time, until—until that point. . . . And after that point—'Girls. We are going to be together.' But free." Detective Hamideh also told Mr. Arriaga-Luna, "I think that their daddy—their daddy can say, 'Yes. I did make a mistake. But I have

my dignity because I told the truth.'" When Mr. Arriaga-Luna asked Detective Hamideh what would happen to his daughters, Detective Hamideh responded, "[Y]es, I can bring resources there so that [your daughters] can be educated and break the cycle here." Less than one hour after the interview began, Mr. Arriaga-Luna confessed to shooting the victim.

¶6    Mr. Arriaga-Luna moved the district court to suppress his confession on the grounds that it was coerced. In ruling on this motion, the court focused its analysis on three aspects of Mr. Arriaga-Luna's interrogation: (1) the threat of a possible life sentence; (2) the use of the false-friend technique, and (3) references to Mr. Arriaga-Luna's children. The district court rejected the defense arguments regarding the possible life sentence and the false-friend technique. However, the district court granted the motion to suppress Mr. Arriaga-Luna's confession based on "[t]he detectives' invocation of Mr. Arriaga-Luna's children as a method to get a confession." The State appealed this ruling, and we have jurisdiction pursuant to Utah Code section 78A-3-102(3)(j).

## STANDARD OF REVIEW

¶7    A district court's determination of whether a confession was voluntary or unconstitutionally coerced involves a mixed question of law and fact. Our review of mixed questions is "sometimes deferential and sometimes not." *Manzanares v. Byington* (*In re Adoption of Baby B.*), 2012 UT 35, ¶ 42, __ P.3d __. In determining how much deference to afford to the district court's decision on a mixed question, we apply a three-part balancing test that considers

> (1) the degree of variety and complexity in the facts to which the legal rule is to be applied; (2) the degree to which a trial court's application of the legal rule relies on facts observed by the trial judge, such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts; and (3) other policy reasons that weigh for or against granting discretion to trial courts.

*State v. Levin*, 2006 UT 50, ¶ 25, 144 P.3d 1096 (internal quotation marks omitted).

¶8    Here, the district court's conclusion that Mr. Arriaga-Luna's confession was coerced was based entirely on its review of the interrogation transcripts and the court's interpretation of the law. Because we are in as good a position as the district court to examine

the transcripts and determine what the law is, we owe the district court no deference. *See Swallow v. Jessop* (*In re United Effort Plan Trust*), 2013 UT 5, ¶ 22, 296 P.3d 742; *In re Adoption of Baby B.*, 2012 UT 35, ¶ 41. When a district court relies on live testimony in an evidentiary hearing where the defendant, interrogators, or other relevant individuals testify regarding the circumstances of the confession and the defendant's characteristics and state of mind at the time of the confession, some deference may be appropriate. *See Levin*, 2006 UT 50, ¶ 26. However, even in such cases, deference may be limited in the interest of developing a uniform body of appellate law to govern police interrogation practices. *See In re Adoption of Baby B.*, 2012 UT 35, ¶ 44.

## ANALYSIS

### I. A CONFESSION IS INVOLUNTARY IF THE WILL OF THE ACCUSED HAS BEEN OVERCOME

¶9 The due process clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution protect individuals from being compelled to incriminate themselves. U.S. CONST. amends. V, XIV; *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). The ultimate goal of analyzing whether a confession was coerced is to determine "whether, considering the totality of the circumstances, the free will of the witness was overborne." *United States v. Washington*, 431 U.S. 181, 188 (1977).

¶10 The totality of the circumstances includes "both the characteristics of the accused and the details of the interrogation." *State v. Rettenberger*, 1999 UT 80, ¶ 14, 984 P.2d 1009 (internal quotation marks omitted). Details of the interrogation include external factors, such as "the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant by the officers." *Id.* The subjective characteristics of the accused that may affect susceptibility to "more subtle forms of psychological persuasion" include "the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system." *Id.* ¶ 15 (internal quotation marks omitted). Additionally, for a confession to be involuntary there must be a causal connection between the coercion and the confession. *State v. Mabe*, 864 P.2d 890, 894 (Utah 1993).

¶11 As the U.S. Supreme Court has long held, "certain interrogation techniques, either in isolation or as applied to the unique character of a particular suspect, are so offensive to a civilized

system of justice that they must be condemned," and confessions resulting from them are inadmissible. *Miller v. Fenton*, 474 U.S. 104, 109 (1985). Threats or promises render a confession involuntary if, in light of the totality of the circumstances, they overcome a defendant's free will. *See Arizona v. Fulminante*, 499 U.S. 279, 285 (1991) (rejecting a per se rule that any confession following a threat or promise is involuntary and analyzing the voluntariness of a confession based on the totality of the circumstances). For example, we have held that "an interrogation can be impermissibly coercive because [it] carried a threat of greater punishment or a promise for lesser punishment depending on whether [a defendant] confessed." *Rettenberger*, 1999 UT 80, ¶ 29, 984 P.2d 1009 (alterations in original) (internal quotation marks omitted). Police may, however, give a suspect realistic estimates about probable sentences. *State v. Montero*, 2008 UT App 285, ¶ 14, 191 P.3d 828.

¶12 In *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) and *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), the defendants' confessions were held to have been coerced because the interrogating officers made threats regarding the defendants' children. The police officers in *Lynumn* encircled a single mother and told her that she would not see her children again unless she admitted to being a drug dealer. 372 U.S. at 531–32. The officers also told Lynumn that her children's government assistance would be withdrawn unless she confessed. *Id.* at 534. The U.S. Supreme Court held that the threats regarding Lynumn's children, viewed in light of her lack of experience with criminal law and lack of counsel, overcame her free will and produced an involuntary confession. *Id.* at 534.

¶13 In *Tingle*, the Ninth Circuit held more broadly that "[w]hen law enforcement officers deliberately prey upon the maternal instinct and inculcate fear in a mother that she will not see her child in order to elicit 'cooperation,' they exert . . . 'improper influence.'" 658 F.2d at 1336. There, police interrogated a young mother who was suspected of bank robbery and told her that she "would not see [her] child for a while if she went to prison." *Id.* at 1333–34.

¶14 Although we recognize that the intense loyalty and emotion present in most parent-child relationships does provide an opportunity for coercion, we do not adopt any per se rule regarding the effect of references to a defendant's children on the voluntariness of a confession. The ultimate test in any case involving the voluntariness of a confession is whether the defendant's will has been overcome under the totality of the circumstances.

## II. THE TOTALITY OF THE CIRCUMSTANCES SHOW THAT MR. ARRIAGA-LUNA'S WILL WAS NOT OVERCOME

¶15   We agree with the district court that it was not improper for the officers to inform Mr. Arriaga-Luna about charges and sentences he could realistically face. *See State v. Montero*, 2008 UT App 285, ¶ 14, 191 P.3d 828. We also agree that Mr. Arriaga-Luna did not have any mental or psychological conditions that made him especially susceptible to the false-friend technique. *See State v. Prows*, 2011 UT App 9, ¶ 12, 246 P.3d 1200. However, we reverse the district court's ultimate conclusion that the references in the interrogations to Mr. Arriaga-Luna's children were coercive police tactics that rendered his confession involuntary.

### A. Mr. Arriaga-Luna Was Told That He Would Not See His Daughters Again

¶16   The detectives appealed to Mr. Arriaga-Luna's love for his daughters in three primary ways. First, during the initial interview Detective Arenaz told Mr. Arriaga-Luna, "You're not gonna see [your children]. You're . . . you're gonna be locked in prison the rest of your life." We have held that officers may not threaten a harsher punishment if a defendant does not confess or promise a lighter punishment if the defendant does confess. *See State v. Rettenberger*, 1999 UT 80, ¶ 29–32, 984 P.2d 1009; *State v. Strain*, 779 P.2d 221, 225–26 (Utah 1989). Here, Detective Arenaz made the statements while attempting to coax Mr. Arriaga-Luna to implicate his brother or say that the killing was accidental—not while persuading him to confess to murder. Furthermore, these statements were not improper threats because Mr. Arriaga-Luna in fact faced prison time if found guilty of murder, and separation from one's children is a natural consequence of being in prison. Detective Arenaz did not suggest that Mr. Arriaga-Luna would be able to see his children only if he confessed.

¶17   Mr. Arriaga-Luna argues that Detective Arenaz's statement was a veiled, indirect threat that he must cooperate in order to see his children. We recognize that implicit threats can constitute psychological coercion and overcome a defendant's free will. However, here, the context of the detective's statement clarifies that the statements were not implicit threats but rather factual communications that if Mr. Arriaga-Luna implicated his brother and his brother was found to be the sole murderer, Mr. Arriaga-Luna would not "be locked in prison for the rest of [his] life." Similarly, if the killing were entirely accidental, Mr. Arriaga-Luna would likely be set free. We also note that Mr. Arriaga-Luna did not confess during

this interview, which suggests that the officer's statements did not overcome his free will.[1]

### B. Mr. Arriaga-Luna Was Told That Resources Were Available For His Daughters

¶18 In the second interrogation two days later, Detective Hamideh employed the false-friend technique. Among other things, Detective Hamideh told Mr. Arriaga-Luna, "But yes, I can bring resources there so that [your daughters] can be educated and break the cycle here."

¶19 When defendants are concerned for the safety and welfare of their families, law enforcement can inform defendants of public and charitable resources. However, officers should limit themselves to factual statements and not imply that aid for defendants' families is contingent on a confession. Here, Detective Hamideh strayed close to the line by making a personal offer to help Mr. Arriaga-Luna when he said "I can bring resources." However, it is clear from the full transcript that the officer made the statement about resources in response to Mr. Arriaga-Luna's inquiry about what would happen to his daughters, and not in exchange for a confession.

### C. The Detective Suggested That Mr. Arriaga-Luna's Daughters Would Respect Him If He Told The Truth

¶20 Detective Hamideh also urged Mr. Arriaga-Luna to "give [your daughters] hope that yes, I did what I did. . . . And I am going to take the time, until—until that point. . . . And after that point—'Girls. We are going to be together.' But free." Detective Hamideh also told Mr. Arriaga-Luna, "I think that their daddy—their daddy can say, 'Yes. I did make a mistake. But I have my dignity because I told the truth.'" Thus, the detective urged him to confess to earn the respect of his daughters.

¶21 Such appeals to a defendant's sense of morality and responsibility are usually non-coercive. *See United States v. Miller*,

---

[1] The parties dispute whether the two interrogations should be considered together or whether only the second interrogation, in which Mr. Arriaga-Luna actually confessed, should be considered for purposes of this voluntariness analysis. *See State v. Mabe*, 864 P.2d 890, 894 (Utah 1993) ("The passage of time [between two interrogations] . . . would tend to dissipate any lingering effects of police coercion."). We need not address this issue because even when both interrogations are considered together, we do not find any coercion.

984 F.2d 1028, 1031–32 (9th Cir. 1993) (holding that an FBI agent asking a suspect to consider the "spiritual ramifications" of committing a crime did not overcome the suspect's free will); *State v. Boggs*, 185 P.3d 111, 122 (Ariz. 2008) (en banc) (holding that officers may "solicit a sense of responsibility" regarding a suspect's child to encourage truthful statements); *State v. Newell*, 132 P.3d 833, 843–844 (Ariz. 2006) (en banc) (holding that the detectives' suggestion that a suspect "would feel better if he confessed" was not coercive).

¶22   In *State v. Prows*, 2011 UT App 9 ¶ 10 n.4, 246 P.3d 1200, the court of appeals rejected the defendant's argument that his confession was coerced based on appeals to morality and responsibility. The defendant in *Prows* was being questioned by the police on suspicions of child abuse. *Id.* ¶ 2. The officer told the victim that the step-daughter he was allegedly abusing would likely continue "the cycle of abuse" by herself becoming an abuser in the future. *Id.* ¶ 10 n.4. The court of appeals held that "pointing out such considerations—possibilities over which the police clearly exercise no control—[does not amount] to a threat or promise of the kind pertinent to our inquiry." *Id.* Here, as in *Prows*, Detective Hamideh's suggestion to Mr. Arriaga-Luna that his daughters would respect him if he told the truth does not constitute a threat or promise because Detective Hamideh was merely appealing to Mr. Arriaga-Luna's sense of personal dignity and responsibility and speculating about how his daughters may feel about him in the future.

## III. THE STATE DID NOT INVITE ERROR

¶23   Mr. Arriaga-Luna lastly argues that any error in the court's ruling was invited by the State. Under our case law, a party may not "entice the court into committing an error and then reap the benefit of objecting to that error on appeal." *State v. Moa*, 2012 UT 28, ¶ 25, 282 P.3d 985; *see also State v. Geukgeuzian*, 2004 UT 16, ¶ 12, 86 P.3d 742 (holding that counsel invited error by representing that its jury instruction listed all essential elements and then arguing on appeal that the instructions did not include the mens rea element).

¶24   Mr. Arriaga-Luna asks us to conclude that the state invited error during closing arguments on the motion to suppress the confession. The prosecutor engaged in the following exchange with the district court:

> Court: Would you agree though that in the State of Utah it's almost a bright line distinction in terms of your ability to use an interrogation tactic of the use of your children and threats not to be able to see them[?] . . . So

the moment we address children is the moment we've crossed the line in that interview. Isn't—isn't that really what the state of the law is?

[Prosecutor]: I think you have to significantly use the children, not just mention the children. . . . I don't think it's that absolute. . . . But I could be wrong.

¶25 This statement by the prosecutor did not invite error. The prosecutor was expressing *disagreement* with the court's view that "the moment we address children is the moment we've crossed the line." She was correcting the court's erroneous view and expressing her belief that to "cross[] the line," an interrogator must "significantly use the children." Thus, she did not lead the court down a path of error but rather stated a view consistent with the state's position on appeal that there is no bright-line test regarding references to children in interrogations.

## CONCLUSION

¶26 The totality of the circumstances show that Mr. Arriaga-Luna's free will was not overborne. Accordingly, the trial court erred in granting Mr. Arriaga-Luna's motion to suppress his confession. We reverse and remand for further proceedings consistent with this opinion.

––––––––––