2014 UT App 221

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
DAVID WAYNE GLASSCOCK,
Defendant and Appellant.

Opinion
No. 20120615-CA
Filed September 18, 2014

Third District Court, Salt Lake Department
The Honorable Robin W. Reese
No. 111903576

Peter A. Daines and John B. Plimpton, Attorneys
for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Opinion, in which JUDGE
JOHN A. PEARCE and SENIOR JUDGE PAMELA T. GREENWOOD
concurred.[1]

ROTH, Judge:

¶1      After a bench trial, David Wayne Glasscock was convicted
of aggravated robbery and possession of a firearm by a restricted
person. The conviction hinged on an eyewitness identification
and incriminating statements Glasscock made during an

---

1. The Honorable Pamela T. Greenwood, Senior Judge, sat by
special assignment as authorized by law. *See generally* Utah Code
Jud. Admin. R. 11-201(6).

interview with police. On appeal, Glasscock argues that the confession should have been suppressed because he was heavily intoxicated and police took advantage of his impaired condition by employing coercive interrogation tactics. He also argues that the eyewitness identification was unconstitutionally unreliable. Finally, Glasscock asserts that his trial counsel provided ineffective assistance when he failed to challenge the admission of a prior felony conviction into evidence. We affirm.

BACKGROUND[2]

¶2      In May 2011, a young man (Victim) was standing outside of a community center in Salt Lake County when three men in a gray Dodge Stratus pulled over and parked nearby. One of the men got out of the back seat of the car, ran toward Victim, and put a gun to Victim's head. The man asked Victim if he had any drugs. When Victim did not respond, one of the men in the Stratus told the assailant to hurry up. The assailant took Victim's backpack and got back in the Stratus, which then sped away.

¶3      A woman who saw the Stratus drive off called 911. When police arrived, Victim described his assailant as "a white male in his early 40s" who was "wearing an eye patch." Police located a gray Stratus and followed it to a gas station on North Temple and Redwood Road, not far from where the robbery took place. There were three men in the vehicle—Patrick Woods, a black male in his mid-twenties; Randall Cropper, a white male in his late twenties or early thirties with long hair; and Glasscock, a white male in his fifties with long hair. Woods was driving, Cropper was in the passenger seat, and Glasscock was in the

---

2. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings," and "we present conflicting evidence" only "to the extent necessary to clarify the issues raised on appeal." *State v. Nichols*, 2003 UT App 287, ¶ 2 n.1, 76 P.3d 1173 (citation and internal quotation marks omitted).

back seat. Police ordered the men out of the car and handcuffed them.

¶4    In the meantime, another officer drove Victim to the gas station and parked across the street. Using binoculars, Victim got a "clear view" of each man and identified Glasscock as his assailant. Police searched the vehicle, finding a loaded pistol under the driver's seat and a short rifle and an empty vodka bottle in the trunk. Police then took Glasscock into custody for further investigation.

¶5    During a half-hour interrogation, Glasscock initially claimed that he could not remember what happened because he had been in a "stupor"—he was "toasted" from "eating Lortabs" for his broken hand and foot, and he had been drinking vodka. When pressed, Glasscock admitted that Woods handed him a gun and pressured him to approach Victim. Glasscock denied pointing the gun at Victim and also claimed he could not remember taking a backpack. But when police told him that the backpack had Victim's homework in it, Glasscock admitted that Cropper had thrown the backpack out of the car before police arrived.

¶6    Glasscock was charged with aggravated robbery and possession of a firearm by a restricted person, based on a prior felony conviction. He waived his right to a jury trial and moved to suppress the statements he made to police and Victim's identification.

¶7    At trial, Victim testified and identified Glasscock as his assailant. The State played a video of Glasscock's confession, and the officers that arrested Glasscock and searched the Stratus also testified. In his defense, Glasscock raised the possibility that Victim mistook Cropper for him, arguing that Cropper had access to Glasscock's eye patch and could have used it. Glasscock testified that he did not remember what happened the day of the robbery because, at the time, he had not been taking his medication for a mental illness, he was using heroin, and he had drunk "about three-quarters of a gallon" of vodka. He

claimed not to remember "robbing anybody" or "threatening anybody with a firearm." And he explained that he had tried to tell the detectives what really happened during his interrogation, but they "basically forced [him] to say what they wanted [him] to say." According to Glasscock, he went along with the detectives only because he "was scared to death" after a "bad run-in with the Salt Lake Police Department back in 1987" and because he was "still intoxicated" but "was trying to maintain" so that he did not look intoxicated.

¶8     One of the detectives that interrogated Glasscock countered that Glasscock "seemed pretty good actually, all things considered." And he testified that "compare[d] . . . to other intoxicated individuals" the detective had questioned, Glasscock appeared to be "in pretty good condition." The State also introduced evidence of Glasscock's prior felony conviction for attempted sexual abuse of a child in support of the charge that he was a restricted person in possession of a firearm.

¶9     The district court denied Glasscock's motions to suppress the confession and Victim's identification and found Glasscock guilty of both charges.


ISSUES AND STANDARDS OF REVIEW

¶10    Glasscock raises four claims on appeal. First, he argues that the district court should have granted his motion to suppress the statements he made during the police interrogation because "the interrogating officers exploited his intoxicated, medicated, and injured state," rendering his confession involuntary. We review a district court's "ultimate determination of [the] voluntariness [of a confession] . . . for correctness." *State v. Rettenberger*, 1999 UT 80, ¶ 10, 984 P.2d 1009. But we defer to the court's underlying factual findings unless "they are clearly erroneous." *Id.*

¶11    Second, Glasscock argues that Victim's identification should have been suppressed because the showup procedure

was "unconstitutionally suggestive." The reliability of an eyewitness identification is a question of law, and we review the district court's decision for correctness. *State v. Hollen*, 2002 UT 35, ¶ 28, 44 P.3d 794.

¶12    Third, Glasscock asserts that he received ineffective assistance of counsel when his attorney failed to object to the admission of his prior felony conviction because "it was not admissible under the applicable rules of evidence and was prejudicial to Glasscock's case." "An ineffective assistance claim raised for the first time on appeal presents a question of law." *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162.

¶13    Finally, Glasscock argues that the cumulative effect of these errors deprived him of a fair trial. "Under the cumulative error doctrine, we apply the standard of review applicable to each underlying claim of error" and "will reverse only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." *State v. McNeil*, 2013 UT App 134, ¶ 16, 302 P.3d 844 (omission in original) (citations and internal quotation marks omitted), *cert. granted*, 317 P.3d 432 (Utah 2013).

## ANALYSIS

### I. Glasscock's Confession

¶14    Glasscock argues that his confession was involuntary because the detectives employed "coercive police interrogation tactics" to take advantage of his unstable mental condition, and he argues that "[s]everal of the [court's] findings of fact" supporting the court's denial of his motion to suppress "were clearly erroneous." Specifically, Glasscock maintains that he was "significantly impaired from alcohol, heroin, pain pills" and that "he suffered from multiple disorders, including 'bipolar Type I,' 'post-traumatic stress,' and 'borderline personality.'" And even though the detectives "knew that Glasscock had consumed a number of impairing substances" that had "significantly

impacted [Glasscock's] memory," Glasscock contends that they employed a "false friend technique" and other coercive strategies that "basically forced [him] to say what they wanted [him] to say." After carefully reviewing the evidence in the record, including the video of Glasscock's police interrogation, we agree with the district court that Glasscock's confession was not coerced.

¶15   "The due process clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution protect individuals from being compelled to incriminate themselves." *State v. Arriaga-Luna*, 2013 UT 56, ¶ 9, 311 P.3d 1028. A confession is not compelled, however, "'[s]imply because [a defendant] was under the influence of drugs [or alcohol]'" at the time police questioned him. *State v. Maestas*, 2012 UT App 53, ¶ 39, 272 P.3d 769 (alterations in original) (quoting *United States v. Howard*, 532 F.3d 755, 763 (8th Cir. 2008)). And even if police are aware "of a suspect's mental illness or deficiencies at the time" he confesses, that fact alone is insufficient to demonstrate that the confession is the product of compulsion; the defendant must still demonstrate that police "effectively exploit[ed] those weaknesses" to obtain it. *State v. Rettenberger*, 1999 UT 80, ¶ 18, 984 P.2d 1009 (citing *Colorado v. Connelly*, 479 U.S. 157, 164–65 (1986)). "In other words, the evidence must show that" police employed "coercive tactics . . . [and] overcame the defendant's free will." *State v. Galli*, 967 P.2d 930, 936 (Utah 1998), *superseded by statute on other grounds as recognized in State v. Bowers*, 2012 UT App 353, ¶ 15, 292 P.3d 711.

¶16   To determine whether a confession was voluntary, we look to "[t]he totality of the circumstances," including "both the characteristics of the accused and the details of the interrogation." *Arriaga-Luna*, 2013 UT 56, ¶ 10 (citation and internal quotation marks omitted). Characteristics of the accused that may indicate a particular susceptibility to coercive police tactics include "the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system." *Id.* (citation and internal quotation marks omitted). And details of the interrogation that may be relevant

are "the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant by the officers." *Id.* (citation and internal quotation marks omitted).

¶17   For example, in *State v. Rettenberger*, 1999 UT 80, 984 P.2d 1009, the Utah Supreme Court concluded that a defendant's confession was coerced where police made thirty-six false statements "about testimonial and physical evidence of [the defendant's] guilt" even though "they had *no* physical evidence linking [the defendant] to the crime." *Id.* ¶¶ 21, 45. The court noted that police used a "'false friend technique'" to convince the defendant "that they were his friends and that they were acting in his best interest." *Id.* ¶ 24. Additionally, police made "significant references to [the] defendant being charged with capital murder," and they "strongly suggested that [the defendant] would not face the death penalty as long as he confessed to the crime." *Id.* ¶ 29 (internal quotation marks omitted). The court observed that the defendant was interrogated over a two-day period and kept in solitary confinement for twenty-two hours, *id.* ¶ 33, and that when he finally confessed, he offered "little information that was not first provided or suggested by the interrogating officers," *id.* ¶ 40. And the court also noted that the defendant was vulnerable: he had "below-average cognitive abilities" and other mental conditions that made him particularly susceptible to the coercive tactics police employed. *Id.* ¶ 26.

¶18   Here, the district court found that Glasscock "was lucid and properly oriented" during his interview with the detectives. Although Glasscock's answers evinced some "hesitation at first," the court determined that he "voluntarily cooperated" throughout the interview. The court also determined that there "was insufficient evidence of intoxication, mental defect, or coercion to justify excluding the interview," so the "confession was fully knowing and voluntary." At Glasscock's urging, we have reviewed the video recording of Glasscock's interrogation and find that the district court's findings and conclusions are unassailable.

¶19    Unlike the interrogation in *Rettenberger*, which involved multiple two-hour sessions and a twenty-two-hour period of solitary confinement, Glasscock's interview lasted roughly thirty minutes. The detectives engaged in several minutes of small talk, asking Glasscock where his accent was from, inquiring about why he relocated to Utah from Louisiana, and comparing the catfish in the two states. They also asked him for his birthdate and contact information, which he provided without hesitation. The detectives then advised Glasscock of his rights, and he affirmed that he was willing to continue the interview.

¶20    For the next fifteen minutes, Glasscock offered vague details of his role in the robbery and blamed his spotty memory on alcohol, pain medication, and other drugs. However, his recounting of how he came to be with his two companions, their travels over the hours before the robbery, and other aspects of their interactions was detailed and lucid. He admitted that he handled a gun that day, but claimed he did so only because Woods had handed him the weapon. When asked why he was in Salt Lake City, Glasscock told the detectives that Woods gave him a ride to run some errands before Glasscock could catch a bus back to Layton. But he claimed he had been in a "stupor" after taking pain medication and drinking heavily when "all of a sudden" he found himself lying in the backseat of a car "surrounded by cops." Without any prodding from the detectives, he also mentioned that he "ran into a Mexican dude today" that he initially thought "was one of the Romero brothers from the joint who had tried to stab" him. When he saw him, Glasscock said, he asked Woods to pull over, then "jumped out" and "was fixing to knock the dude on his ass." But he apologized and got back in the car when he realized he was mistaken. When the detectives asked Glasscock if the man had a backpack, he claimed he could not remember because he was "toasted" from "eating Lortabs" and drinking vodka.

¶21    At that point, one detective leaned forward on the table toward Glasscock and began questioning him more aggressively: "Listen. You robbed that guy of his backpack with a gun. Okay? That's what happened. There's no argument there. There's no

discussion there. That's what happened. I want to know what was going through your mind at the time." Glasscock continued to assert that he could not remember because he was "so drunk," and he claimed that "one of the only things" he could remember was that Woods and Cropper "were pressuring" him to find drug dealers to rob. One of the detectives then suggested that Glasscock had mistaken "an 18-year-old kid who is trying to get his GED" for a drug dealer and stole his backpack, and "now [the kid] has to make up all that work because he can't find his backpack."

¶22 When Glasscock continued to plead ignorance, one of the detectives informed him that the other two men in the car "seem like angels to us" because "they're talking to us. You're the only one who is playing this other card." He continued, "Do you want . . . the courts to look at you as a cold blooded straight-up liar . . . or do you want to look like a guy who told the truth?" At that point, Glasscock admitted that Woods had handed him a gun and that he had approached Victim and asked Victim if he was "a dope dealer." He denied taking the backpack, but minutes later admitted that he had taken it and Cropper had thrown the backpack out the window while police were following them to the gas station. Near the end of the interview, one of the detectives asked Glasscock if he was sorry for robbing Victim, and he said yes.

¶23 Throughout the interrogation, there is no indication, other than his own statements, that Glasscock was significantly impaired or suffering from a mental illness, and Glasscock offered neither expert testimony nor medical records at trial to support his own assertion that several mental illnesses—and having gone without medication—made him particularly susceptible to coercive questioning. To the contrary, on the video recording of the interview, he appears alert, he has no difficulty understanding the detectives' questions, and his answers are responsive and lucid. As a consequence, Glasscock has failed to show that the detectives had reason to believe that his drug use was as extensive as he had claimed or that there was any indication that Glasscock was so impaired that he was

"incapable of making a voluntary statement." *See State v. Maestas*, 2012 UT App 53, ¶¶ 39–41, 47, 272 P.3d 769 (concluding a confession was voluntary where, even though the defendant was intoxicated and on pain medication, the defendant did not exhibit any "truly bizarre behavior" that would have alerted police that the defendant was impaired). And even if Glasscock was suffering from the mental disorders he identified in his trial testimony, police are "not routinely required to inquire into a defendant's medical condition prior to questioning him" absent behavior that provides "notice that [the d]efendant's mental state warrant[s] special concern." *Id.* ¶ 40. Glasscock's demeanor throughout the interview simply did not provide the detectives with any reason to question his mental stability.

¶24 Further, even if Glasscock were mentally impaired during the interview, Glasscock has not identified any evidence that calls into question the district court's finding that there was insufficient evidence of coercive tactics that would have overcome his free will. Unlike the officers in *Rettenberger* who employed a variety of threats, made false promises, placed the defendant in solitary confinement for twenty-two hours, and refused his request to speak with his parents, 1999 UT 80, ¶¶ 21–36, 984 P.2d 1009, the detectives' questioning in this case was straightforward, built on Glasscock's own statements and inconsistencies, and lasted only half an hour. The detectives did not misrepresent the strength of the evidence against Glasscock, make any threats, or falsely promise significantly more lenient treatment if he confessed. Glasscock has therefore failed to show that the district court was incorrect when it found that "[t]here was insufficient evidence of intoxication, mental defect, or coercion to justify excluding the interview." As a consequence, we also agree with the court's ultimate legal conclusion that Glasscock's confession "was fully knowing and voluntary."

## II. The Lineup Procedure

¶25 Glasscock also argues that his "due process rights were violated when the prosecution was allowed to introduce [Victim's] identification of him as the robber because the

circumstances surrounding the identification were unconstitutionally suggestive." In particular, he maintains that Victim offered a "fairly generic description" of his assailant that "fits Cropper about as much as it fits Glasscock" and provided more specific details only after he saw Glasscock during a "highly suggestive show up procedure."

¶26 The Due Process Clause of the Utah Constitution bars the admission of unreliable eyewitness identifications into evidence. *State v. Hollen*, 2002 UT 35, ¶ 26, 44 P.3d 794. To evaluate the admissibility of an eyewitness identification, we examine the "totality of the circumstances" to determine whether "the eyewitness testimony . . . is sufficiently reliable [so] as not to offend a defendant's right to due process." *State v. Guzman*, 2006 UT 12, ¶ 21, 133 P.3d 363. The Utah Supreme Court has set forth five factors that guide this inquiry:

> (1) [T]he opportunity of the witness to view the actor during the event; (2) the witness's degree of attention to the actor at the time of the event; (3) the witness's capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness's identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember and relate it correctly.

*State v. Ramirez*, 817 P.2d 774, 781 (Utah 1991) (alteration in original) (citation and internal quotation marks omitted), *holding modified by State v. Thurman*, 846 P.2d 1256 (Utah 1993). After carefully examining the evidence in the record, we conclude that the district court did not err in concluding that the eyewitness identification in Glasscock's case was sufficiently reliable.

¶27 The circumstances surrounding Victim's identification of Glasscock are far less troubling than those in *State v. Ramirez*, 817 P.2d 774 (Utah 1991), *holding modified by State v. Thurman*, 846

P.2d 1256 (Utah 1993), where our supreme court concluded no constitutional violation occurred. In *Ramirez*, an eyewitness saw a man with a gun "crouched near the end of [a] building, wearing a mask over the lower part of his face." *Id.* at 782. The witness viewed the gunman for less than a minute while another man with a pipe was "threatening and swinging the pipe" at the witness. *Id.* at 782–83. At one point, the man with the pipe "hit [the witness] in the stomach" while a "masked robber . . . point[ed] a pistol at him." *Id.* at 783. The witness identified the defendant as the gunman "thirty minutes to an hour after the crime" when he saw the defendant "on the street in the middle of the night," alone, "with his hands cuffed to a chain link fence behind his back," and the "headlights of several police cars . . . trained on him." *Id.* at 783–84. The court noted that despite the "blatant suggestiveness of the showup" procedure and the fact that the witness never "saw the full face of the gunman," it was "an extremely close case." *Id.* at 784. Ultimately, the court concluded that admitting the eyewitness testimony did not violate the defendant's constitutional rights. *Id.*

¶28 Here, the fact that Victim had a gun pointed at his head during the robbery likely affected his capacity to observe his assailant. But unlike the witness in *Ramirez*, who never saw the defendant without a mask and identified him during a "blatant[ly] suggestive[]" showup procedure at night, *see id.* at 782, 784, Victim was assaulted around 2:30 p.m., was face-to-face with his assailant, and identified Glasscock as the robber less than one hour later in broad daylight. And unlike the highly suggestive showup procedure in *Ramirez* where the witness viewed the defendant all alone, handcuffed to a fence, and spotlighted, *see id.* at 784, Victim was able to see all three of the men the police apprehended in the Stratus—including Cropper, the man Glasscock claims may have committed the robbery. We therefore agree with the district court that Victim's eyewitness identification was not unreliable and its admission into evidence did not violate Glasscock's constitutional rights.

III. Ineffective Assistance

¶29   Glasscock next claims that he received ineffective assistance of counsel when his attorney failed to object to the admission into evidence of his prior conviction for attempted sexual abuse of a child. He argues that the conviction "was not admissible under rule 404(b) of the Utah Rules of Evidence" and that the nature of the charge "allowed the trial court to look past the many troubling aspects of the State's case." To prevail on an ineffective assistance of counsel claim, Glasscock must show both that his trial counsel's performance "was deficient" and "that the deficient performance prejudiced" his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). We conclude that failing to object to the admission of Glasscock's felony conviction into evidence was not deficient performance because the conviction was admissible, and Glasscock was not prejudiced by the timing of its admission because he was tried before a judge, not a jury.

¶30   Glasscock is correct that rule 404(b) of the Utah Rules of Evidence bars the admission of bad acts evidence to prove a propensity for criminal behavior. The rule is designed "to ensure that a defendant is only convicted because he committed the charged offense and not because the jury is convinced of his cumulative bad behavior." *State v. Houskeeper*, 2002 UT 118, ¶ 24, 62 P.3d 444. And it is certainly true that evidence of "a prior sexual offense against a child is particularly likely to suggest a verdict on an improper, emotional basis." *State v. Fowers*, 2011 UT App 383, ¶ 22, 265 P.3d 832 (citation and internal quotation marks omitted).

¶31   Here, however, Glasscock was charged with a second degree felony for possession of a firearm by a restricted person, which requires evidence that the defendant has a prior conviction for a "violent felony." Utah Code Ann. § 76-10-503(1)

(LexisNexis 2012).[3] Attempted sexual abuse of a child is a violent felony. *Id.* § 76-3-203.5(1)(c)(i)(W). When evidence of a "defendant's prior convictions [is] relevant to establish an essential element of the crime charged, it is admissible at the appropriate time of trial . . . unless 'its probative value is substantially outweighed by the danger of unfair prejudice.'" *State v. Florez*, 777 P.2d 452, 456 (Utah 1989) (quoting Utah R. Evid. 403). Here, Glasscock's conviction was directly relevant to establishing an element of the unlawful firearm possession charge and was therefore admissible. And because the evidence was admissible, the only real issue for his counsel was the timing of its admission, something that Glasscock does not address on appeal.

¶32    However, even if Glasscock had addressed the issue, it is unlikely that he could have shown prejudice in this case. Glasscock's central concern is that a factfinder would be unable to objectively examine the evidence pertinent to the aggravated robbery charge after being advised that he had a prior felony conviction for attempted sexual abuse of a child. We are certainly mindful that evidence that a defendant attempted to sexually abuse a child "may have an emotional impact on a jury that could suggest a decision on an improper basis." *State v. Burke*, 2011 UT App 168, ¶ 40, 256 P.3d 1102. But this was a bench trial, not a jury trial, and the district court's knowledge of a prior conviction does not raise the specter of prejudice to the same degree that a jury's awareness would.[4] Indeed, "we have

---

3.  Because these statutory provisions have not been substantively amended, we cite to the current version of the Utah Code.

4. Glasscock has not argued that his trial counsel should have asked the court to bifurcate the trial, nor has he asserted that trial counsel should have stipulated that Glasscock committed a felony for purposes of the firearms charge to avoid revealing the

(continued...)

traditionally assumed that judges are capable of properly sorting and evaluating evidence presented to them and are much less subject to improper influence than a lay jury." *State v. Hallet*, 796 P.2d 701, 707 (Utah Ct. App. 1990), *aff'd*, 856 P.2d 1060 (Utah 1993); *see also Adams*, 2011 UT App 163, ¶ 12 (noting that "judges in bench trials are presumed to be less likely than juries to be prejudiced by prior bad acts evidence"). Glasscock has not demonstrated that the evidence of his prior conviction affected the district court's decision in any material way.

¶33    We therefore conclude that the failure of Glasscock's counsel to challenge the admission of his felony conviction did not amount to ineffective assistance of counsel. Evidence of the felony conviction was admissible on the firearms charge, and because Glasscock was tried before a judge, admitting the felony conviction in the same proceeding as the aggravated robbery charge does not undermine our confidence in the verdict. *See State v. Hales*, 2007 UT 14, ¶ 86, 152 P.3d 321 (noting that to demonstrate prejudice, a defendant must show "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt," or in other words, the errors "undermine confidence in the [verdict]" (citations and internal quotation marks omitted)).

## IV. Cumulative Error

¶34    Finally, Glasscock argues that the cumulative effect of the three errors he identifies should undermine our confidence that he had a fair trial. "Under the cumulative error doctrine, we will reverse only if the cumulative effect of the several errors undermines our confidence . . . that a fair trial was had." *State v. Kohl*, 2000 UT 35, ¶ 25, 999 P.2d 7 (omission in original) (citation and internal quotation marks omitted). Having found no error, Glasscock's cumulative error claim fails.

---

nature of his offense. We therefore do not discuss the availability or propriety of either option.

CONCLUSION

¶35   We affirm the district court's decision denying Glasscock's motions to suppress his confession and the eyewitness identification. We also conclude that Glasscock did not receive ineffective assistance of counsel. Consequently, Glasscock's convictions are affirmed.

_____