2018 UT App 73

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CHRISTOPHER YOUNG,
Appellant.

Opinion
No. 20160045-CA
Filed April 26, 2018

Fifth District Court, Cedar City Department
The Honorable Keith C. Barnes
No. 141500275

Dale W. Sessions, Attorney for Appellant

Sean D. Reyes and Jeffrey D. Mann, Attorneys
for Appellee

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES JILL M. POHLMAN and DIANA HAGEN concurred.

CHRISTIANSEN, Judge:

¶1     During an interview with police, Defendant Christopher
Young confessed to sexually abusing Victim. The State charged
Defendant with three counts of aggravated sexual abuse of a
child, three counts of sodomy on a child, and one count of rape
of a child, all first degree felonies. Before trial, Defendant filed a
motion to suppress his confession, which the trial court denied.

¶2     A jury convicted Defendant as charged, and the trial court
sentenced him to fifteen years to life on each of the three
aggravated sexual abuse of a child counts, twenty-five years to
life on each of the three sodomy on a child counts, and twenty-
five years to life on the rape count. The court ordered that the
sexual abuse sentences run concurrent with each other, that the

sodomy sentences run concurrent with each other but consecutively to the sexual abuse sentences, and that the rape sentence run consecutively to the sexual abuse and sodomy sentences. Defendant contends that the trial court erred in denying his motion to suppress and abused its discretion in sentencing him to consecutive sentences. We affirm.

BACKGROUND

¶3    In April 2014, officers with the Cedar City Police Department transported Defendant to the police station, where a detective interviewed Defendant regarding allegations that he had sexually abused Victim over the course of several years. According to Defendant, when he was initially approached by the police officers, they told him that "there was something wrong with [his] family and to come with them."

¶4    The interview began at 9:26 a.m. and was recorded by audio and video. The detective began the interview by assuring Defendant that his family was safe. The detective told Defendant, "First of all, [the officer] said you were worried. So I want to let you know, your family is safe." Defendant replied, "Okay." The detective repeated that Defendant's family was "okay" and told Defendant that he could "relax, [and] put [his] mind at ease in that regard."

¶5    The detective then gave Defendant a written waiver of rights form, which set forth Defendant's *Miranda* rights.[1] *See*

---

1. The form listed "Your Rights" as:
        1) You have the right to remain silent.
        2) Anything you say can and will be used against
        you in a court of law.
        3) You have the right to have an attorney present, if
        you can not afford to hire an attorney, one will be

                                                    (continued…)

*generally Miranda v. Arizona*, 384 U.S. 436 (1966). The detective asked Defendant to look over the form, and Defendant read and signed the form. The detective asked Defendant, "You understand each of those parts of that, fully?" Defendant replied, "Yes."

¶6     The detective began his questioning by asking Defendant about his family and work situation. When talking about his work, Defendant mentioned that he had worked from 10 p.m. to 7 a.m. the previous night, and he once stated that he was "[v]ery tired." Approximately twenty minutes into the interview, Defendant confessed to lying naked in bed with Victim, and he thereafter confessed to several other instances of sexual abuse. The interview lasted approximately two hours and included several breaks.

---

(…continued)
> appointed through the judicial process. Juvenile: you also have the right to have a parent present.
> 4) If you decide to answer questions now without having an attorney present, you can stop answering questions at any time during this process and request that an attorney be present.
> 5) Do you understand these constitutional rights as I have explained them to you?

The "Waiver of Rights" portion of the form stated:
> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

¶7     The State charged Defendant with three counts of aggravated sexual abuse of a child, three counts of sodomy on a child, and one count of rape of a child, all first degree felonies. Before trial, Defendant moved to suppress his confession on the ground that it was involuntary, and he requested an evidentiary hearing. The parties stipulated to allow the trial court to review the video recording of Defendant's interview before the hearing.

¶8     Both the detective and Defendant testified at the hearing. Following the hearing, Defendant filed a memorandum in support of his motion. Defendant set forth six facts and cited several cases discussing the voluntariness of confessions; however, he failed to explain with any specificity why his confession was involuntary. The trial court concluded that Defendant's confession had been voluntarily made and denied Defendant's motion to suppress. The court determined that Defendant had voluntarily, knowingly, and intelligently waived his *Miranda* rights, that the detective had "clearly explained that [Defendant's] family was safe and okay prior to the conversation concerning the waiver of [Defendant's] rights," and that "[t]he facts do not support [the detective] using deception, physical abuse, threats, promises, or deprivation of food, medical treatment, or sleep to coerce [Defendant's] confession."

¶9     A jury convicted Defendant as charged, and the trial court ordered Defendant to cooperate with Adult Probation and Parole in completing a presentence investigation report (the PSI Report). The PSI Report contained information about Defendant, such as his life history, criminal history, rehabilitative needs, education, and employment. The PSI Report recommended that Defendant be sentenced to a term of twenty-five years to life for each of the three sodomy on a child counts and for the rape of a child count, and fifteen years to life for each of the three sexual abuse of a child counts. It did not include a recommendation regarding whether Defendant's sentences should run concurrently or consecutively. The PSI Report also

recommended that Defendant be ordered to pay a $10,000 fine for each of the sodomy and sexual abuse counts and $2,139.49 of restitution to Victim for her treatment costs.

¶10 At sentencing, Victim's mother read a letter from Victim and also addressed the court herself. The State briefly discussed the negative impact Defendant's actions had had on Victim and requested that the court "run at least two of those charges consecutively with one . . . another." Defendant's trial counsel discussed Defendant's "lack of criminal history" and the fact that, before Defendant was arrested, he was "hard-working and helped support his family." Trial counsel asked "that the Court run these matters concurrently . . . with each other." Defendant also addressed the court, expressing remorse for his actions.

¶11 The trial court sentenced Defendant to fifteen years to life on each of the three aggravated sexual abuse of a child counts, twenty-five years to life on each of the three sodomy on a child counts, and twenty-five years to life on the rape count. The court ordered that the sexual abuse sentences run concurrent with each other, that the sodomy sentences run concurrent with each other but consecutively to the sexual abuse sentences, and that the rape sentence run consecutively to the sexual abuse and sodomy sentences. In addition, the court ordered that Defendant pay a $10,000 fine for each of the seven counts and $2,139.49 in restitution. Defendant appeals.

ISSUES AND STANDARDS OF REVIEW

¶12 Defendant contends that the trial court erred in failing to suppress his statements from the police interview. On appeal from a trial court's denial of a motion to suppress, we review the trial court's factual findings for clear error and its conclusions of law for correctness. *In re P.G.*, 2015 UT App 14, ¶ 2, 343 P.3d 297.

¶13 Defendant next contends that the trial court abused its discretion in sentencing him to consecutive prison terms. We review the trial court's sentencing decision for an abuse of discretion. *State v. Fretheim*, 2014 UT App 210, ¶ 11, 335 P.3d 374. A court abuses its discretion in sentencing when it fails "to consider all legally relevant factors." *Id.* (citation and internal quotation marks omitted). However, "judges have no obligation to make findings of fact on each statutory factor," and "we will affirm a sentencing decision even where the trial court failed to make findings on the record whenever it would be reasonable to assume that the court actually made such findings." *Id.* (citations and internal quotation marks omitted).

ANALYSIS

I. The Admissibility of Defendant's Confession

¶14 Defendant contends that "[t]he trial court erred in failing to suppress the statements made by [him] during his police interview" because those statements were "made under circumstances that amount to coercion." According to Defendant, he was "exhausted and deceived" by the detective during his interview, and the police officers' "suggestion that something had happened to his family was continually on the mind of [Defendant] while he was being interrogated."

¶15 "The due process clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution protect individuals from being compelled to incriminate themselves." *State v. Arriaga-Luna*, 2013 UT 56, ¶ 9, 311 P.3d 1028; *see also* U.S. Const. amends. V, XIV. "The ultimate goal of analyzing whether a confession was coerced is to determine whether, considering the totality of the circumstances, the free will of the witness was overborne." *Arriaga-Luna*, 2013 UT 56, ¶ 9 (citation and internal quotation marks omitted).

¶16    The totality of the circumstances includes "both the characteristics of the accused and the details of the interrogation." *State v. Rettenberger*, 1999 UT 80, ¶ 14, 984 P.2d 1009 (citation and internal quotation marks omitted). Relevant characteristics of the accused include "the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system." *Id.* ¶ 15. Relevant circumstances surrounding an interrogation include "the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant by the officers." *Id.* ¶ 14.

¶17    The trial court first determined that Defendant had "waived his *Miranda* rights voluntarily, knowingly, and intelligently." Specifically, the court observed that Defendant had signed the waiver form, "explicitly indicating he understood his rights and that he wished to waive them." The court also noted that the detective had "handed and observed [Defendant] look over the waiver form for more than thirty seconds" and that he "confirmed twice vocally during the interview that [Defendant] understood each of the parts of the waiver fully." Although Defendant had "alluded to signing the waiver [form] in an effort to help his family" during his testimony at the evidentiary hearing, the court determined that the detective had clearly explained to Defendant that his family "was safe and okay prior to the conversation concerning the waiver of [Defendant's] rights." Lastly, the court determined that "[t]he facts do not support [the detective] using deception, physical abuse, threats, promises, or deprivation of food, medical treatment, or sleep to coerce [Defendant's] confession." The court therefore concluded that Defendant's confession was made voluntarily.

¶18    On appeal, Defendant asserts that two subjective factors rendered his confession involuntary—his mental health and emotional instability. *See Rettenberger*, 1999 UT 80, ¶ 15.

Specifically, Defendant asserts that he was emotional due to the police officers' "suggestion that something had happened to [Defendant's] family." He also asserts that he was fatigued during the interview. We consider these subjective characteristics, "especially as known to the interrogating officers, to determine the extent to which those characteristics made [Defendant] more susceptible to manipulation." *See id.* ¶ 37.

¶19    Defendant first asserts that he was "deceived" by the police officers' "suggestion that something had happened to his family." According to Defendant, this suggestion "was continually on [his] mind . . . while he was being interrogated," and his "rational intellect was compromised by emotion over his family." Defendant claims that "[w]ithout the pressure of [the officers] assert[ing] that something had happened to [his] family and sustaining that pressure throughout the interview, the confession would not have occurred."

¶20    In making this argument, Defendant relies on his testimony from the evidentiary hearing. There, Defendant testified that when he was approached by police officers, they told him that "something was wrong with [his] family and to come with them." Defendant testified that while he was waiting in the interrogation room, he was "wondering what was happening to [his] family" and "[s]till thought that something was wrong with [his] family." Defendant claimed that he signed the *Miranda* waiver form "trying to help out in any way [he] could, trying to figure out if [his] wife—or if [his] family's been hurt or missing." We are not persuaded.

¶21    The interview transcript reveals that shortly after the detective entered the interrogation room, and before he gave Defendant the waiver of rights form or started questioning Defendant, the detective told Defendant, "First of all, [the officer] said you were worried. So I want to let you know, your family is safe." Defendant replied, "Okay." The detective

reiterated that Defendant's family was "okay" and told Defendant that he could "relax, [and] put [his] mind at ease in that regard." At no point thereafter did Defendant express concern for his family's safety, nor is there anything in the record to suggest that the detective attempted to exploit Defendant's concern for his family's safety to obtain Defendant's confession. *See generally Rettenberger*, 1999 UT 80, ¶ 18 ("[A] confession may be suppressed in circumstances in which a police officer knows of a suspect's mental illness or deficiencies at the time of the interrogation and effectively exploits those weaknesses to obtain a confession."). Thus, even assuming the officers initially persuaded Defendant to come with them by suggesting that something was wrong with his family, we agree with the trial court that the detective "clearly explained that [Defendant's] family was safe and okay prior to the conversation concerning the waiver of Defendant's rights." Although Defendant originally believed his family was in danger, the detective dispelled that notion before Defendant chose to waive his rights and make a statement to the detective. As a result, any trickery that the police officers may have initially used to gain Defendant's cooperation was not used to coerce his confession.

¶22 Defendant also claims that his confession was coerced because he was tired. Toward the beginning of his interrogation, Defendant told the detective that he had worked the previous night and was "[v]ery tired." At the evidentiary hearing, Defendant asserted that he "would have had a better understanding of what was being asked" if he had had adequate rest and not worked all night the night before his interview. Again, we are not persuaded.

¶23 The interview transcript shows that Defendant only once asserted that he was "[v]ery tired"; he did not indicate to the detective that he needed to lie down or sleep, or that he could not understand the questions being asked of him. *See generally State v. Montero*, 2008 UT App 285, ¶ 20, 191 P.3d 828 (observing

that the defendant had asked only once to lie down and concluding that "[h]ad [the defendant] been truly exhausted . . . , he would have renewed his request[]"). And the detective testified at the evidentiary hearing that he did not see any signs of fatigue: "I myself worked many graveyard shifts, and I can understand fatigue, but we discussed and he didn't show any signs of impairment like you generally see where you'd have to repeat statements or [he] didn't understand . . . ." The detective testified that Defendant "appeared to be alert" and "articulate." Moreover, the interview transcript reveals that Defendant began confessing relatively early in the interview, thereby "reduc[ing] the possibility that sleep deprivation caused the confession." *See State v. Piansiaksone*, 954 P.2d 861, 866 (Utah 1998) (concluding that "the fact that [the defendant] inculpated himself early in the interview reduced the possibility that sleep deprivation caused the confession"). We conclude that there is no indication that Defendant's alleged fatigue affected the voluntariness of his confession, and thus we agree with the trial court that "the facts do not support" the detective using "deprivation of . . . sleep to coerce [Defendant's] confession."

¶24    Aside from his concerns about his family and his alleged fatigue, Defendant does not assert that any other factors rendered his confession coerced or otherwise challenge the trial court's findings. Looking at the totality of the circumstances, our review of the record persuades us that Defendant's confession was voluntary. Thus, we conclude that the trial court did not err when it denied Defendant's motion to suppress his confession.

## II. Consecutive Sentences

¶25    Defendant contends that "[t]he trial court committed error in ordering [him] to serve consecutive sentences."

¶26    Utah Code section 76-3-401 authorizes a trial court to impose consecutive sentences when a defendant has been convicted of more than one felony offense. Utah Code Ann. § 76-

3-401(1) (LexisNexis 2012). Before imposing consecutive sentences, however, the court must consider "the gravity and circumstances of the offenses, the number of victims, and the history, character, and rehabilitative needs of the defendant." *Id.* § 76-3-401(2). On appeal, the burden is on Defendant "to show that the trial court did not properly consider all the factors." *State v. Helms*, 2002 UT 12, ¶ 16, 40 P.3d 626. Moreover, "we will not 'assume that the trial court's silence, by itself, presupposes that the court did not consider the proper factors as required by law.'" *State v. McDaniel*, 2015 UT App 135, ¶ 5, 351 P.3d 849 (quoting *Helms*, 2002 UT 12, ¶ 11). "Rather, we will uphold the sentencing court's decision so long as, based on the record before this court, it would be reasonable to assume that the sentencing court actually considered each factor." *Id.*

¶27    Here, the trial court did not make any specific findings on the record regarding the statutory factors, nor did the court explicitly state whether it had read the PSI Report. Defendant implies that the fact that the trial court did not make "[e]ven a casual reference" to the PSI Report demonstrates that the court failed to consider it. He also asserts that the trial court failed to properly consider three statutory factors: his criminal history, his rehabilitative needs, and his character. *See* Utah Code Ann. § 76-3-401(2). We are not persuaded.

¶28    Defendant has not directed us to any legal authority requiring the court to refer to the PSI Report when imposing sentence, and he acknowledges that this court "will not 'assume that the trial court's silence, by itself, presupposes that the court did not consider the proper factors as required by law.'" *See McDaniel*, 2015 UT App 135, ¶ 5 (quoting *Helms*, 2002 UT 12, ¶ 11). In any event, although the court did not mention the PSI Report specifically, its other comments indicate that it had read and considered the PSI Report. In imposing sentence, the trial court ordered Defendant to pay $2,139.49 in restitution for Victim's treatment costs. Importantly, the information regarding

Victim's treatment costs was contained only in the PSI Report—the PSI Report recommended that Defendant "be ordered to pay restitution for all verifiable treatment costs for the victim in this case," which amounted to "$2,139.49" as of the date of the report. While best practices suggest that a sentencing court should, at a minimum, disclose on the record whether it has reviewed the PSI Report and/or considered the requisite statutory factors in imposing sentence, we conclude that the trial court's apparent adoption of the PSI Report's recommendation regarding restitution indicates that the court had read and considered the report in making its sentencing decision.

¶29   Turning to Defendant's criminal history, Defendant correctly observes that the PSI Report stated that his criminal history consisted of only one misdemeanor, for which he successfully completed probation, and that he scored a "negative one" on the offender matrix.[2] Trial counsel also addressed this issue at the sentencing hearing when he discussed Defendant's "lack of criminal history" and emphasized that Defendant's matrix score was "a negative number." Consequently, the record demonstrates that the trial court was aware of the information regarding Defendant's criminal history, and we have no reason to conclude that the court did not consider that information in its sentencing decision.

¶30   Defendant also claims that the trial court failed to consider his rehabilitative needs. Specifically, Defendant asserts that he had a "history of depression and anxiety and would

---

2. The Utah Sentencing Commission's general matrix compares a defendant's criminal history assessment score with the degree of the offense that is the subject of the conviction. *State v. Harvey*, 2015 UT App 92, ¶ 3, 348 P.3d 1199. The matrix creates a starting point for sentencing judges by reflecting a recommendation for a typical case. *Id.*

benefit from therapy and counseling where he could learn to deal with his mental health properly." Trial counsel did not discuss Defendant's rehabilitative needs at the sentencing hearing; however, the PSI Report related that Defendant had a "history of depression and anxiety," that his emotions were "up and down," and that he "[h]as concerns about mental health and could benefit from an evaluation." As previously discussed, although the trial court did not explicitly mention the PSI Report, the court cited other information contained only in the PSI Report, indicating that the court had read and considered the report in making its sentencing decision. We are therefore not persuaded that the court failed to adequately consider Defendant's rehabilitative needs as described in the PSI Report.

¶31 Finally, Defendant argues that his behavior at sentencing "spoke volumes of [his] character" and that his conduct "should have been given adequate weight as a mitigat[ing] circumstance." Defendant observes that, during the sentencing hearing, he "expressed shame, regret and sorrow for the hurt he caused . . . and ultimately for the choices he had made." He was "deeply remorseful," "took responsibility" for his actions, and "exhibited a gracious attitude toward the jail staff and the trial court." In addition, trial counsel discussed "how hard-working [Defendant] was" and that, at the time Defendant was arrested, he "was employed at three different jobs [and] worked very hard for the family." According to Defendant, this "relevant behavior . . . spoke volumes of his character that the trial court should have given weight in considering concurrent sentences."

¶32 It is not enough, however, for Defendant to argue that the court may have altered its sentencing decision if it had weighed the various sentencing factors differently or given more weight to Defendant's character specifically. Rather, Defendant "must demonstrate that no reasonable person would have ordered consecutive sentences given the information presented to the [trial] court." *See McDaniel*, 2015 UT App 135, ¶ 11. He has failed

to do so. The record demonstrates that the information regarding Defendant's character was properly before the court and that the court simply concluded that the other factors supporting consecutive sentences outweighed Defendant's character and behavior at sentencing. *See State v. Epling*, 2011 UT App 229, ¶ 22, 262 P.3d 440 ("The fact that the trial court assessed the relevant factors differently than [the defendant] would have liked does not indicate that it exceeded its discretion."). Given the gravity and circumstances of Defendant's offenses, we simply cannot say that no reasonable person would have ordered consecutive sentences. *See McDaniel*, 2015 UT App 135, ¶ 11. Indeed, where the trial court could have potentially ordered all seven sentences to run consecutively, the record demonstrates that the court gave thoughtful consideration to its sentencing decision, grouping the similar offenses together and ordering the three groups of offenses to run consecutively.[3]

---

3. In support of his concurrent-sentences argument, Defendant also asserts that "[t]he Board of Pardons [and Parole] is best suited to determine the length of the actual sentence." However, we agree with the State that "the trial court's decision to impose consecutive sentences does not limit the Board's discretion to evaluate and manage Defendant's rehabilitative needs." The Board retains the power to determine "when and under what conditions" Defendant may be released from prison. Utah Code Ann. § 77-27-5(1)(a) (LexisNexis 2012). Indeed, the Board has the authority to release any offender sentenced to a felony on or after April 29, 1996, "before the minimum term has been served [if] the board finds mitigating circumstances which justify the release," subject to a "full hearing" and appropriate notice. *See id.* § 77-27-9(1)(a)–(b); *see also State v. Gray*, 2016 UT App 87, ¶ 41, 372 P.3d 715 (observing that the Board "has discretion to release an inmate who is sentenced to prison for [sex crimes against children] before the inmate has served an otherwise mandatory

(continued…)

¶33    In sum, we conclude that Defendant has failed to demonstrate that the trial court did not consider all legally relevant factors in imposing consecutive sentences. He has also failed to demonstrate that the trial court abused its discretion in imposing consecutive sentences.

## CONCLUSION

¶34    Examining the totality of the circumstances, we see no error in the trial court's ruling that Defendant's confession was voluntarily made. In addition, Defendant has failed to demonstrate that the trial court failed to consider all legally relevant factors in imposing consecutive sentences or that the court abused its discretion by deciding to impose consecutive sentences.

¶35    Affirmed.

————————

(…continued)

minimum term"). Thus, Defendant's claim that imposing consecutive sentences usurps the Board's role in determining the amount of time he actually serves is not well taken.