**2023 UT App 53**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
STEVEN CRUTCHER,
Appellant.

Opinion
No. 20180322-CA
Filed May 18, 2023

Sixth District Court, Manti Department
The Honorable Wallace A. Lee
No. 131600150

Ann M. Taliaferro, Attorney for Appellant

Sean D. Reyes and David A. Simpson,
Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGE DAVID N. MORTENSEN and
SENIOR JUDGE RUSSELL W. BENCH concurred.[1]

ORME, Judge:

¶1      Steven Crutcher entered a conditional guilty plea to first-degree aggravated murder after confessing to the racially-motivated murder of his cellmate (Cellmate). Less than a month later, Crutcher wrote to the district court retracting his confession, claiming it was not made of his own free will, and communicating his wish to withdraw his plea. Crutcher now appeals the court's denial of his pre-plea motion to suppress, his post-plea motion to withdraw his guilty plea, and his counsel's

---

1. Senior Judge Russell W. Bench sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

(Counsel) post-plea motion to withdraw as Crutcher's counsel. We affirm.

## BACKGROUND

¶2     In the spring of 2013, Cellmate was found dead under suspicious circumstances at the Central Utah Correctional Facility (CUCF) located in Sanpete County. Following an autopsy and further investigation, Cellmate's cause of death was determined to be homicide by ligature strangulation.

*The Investigation and Pre-Plea Communications*

¶3     After the discovery of Cellmate's death, Crutcher was moved from their shared cell at the CUCF Hickory housing unit to a cell in the Dogwood housing unit to be housed alone.[2] The lead investigator (Investigator), accompanied by a CUCF detective (First Detective), met with Crutcher. When Crutcher invoked his *Miranda* rights, questioning stopped, and Investigator and First Detective left.

¶4     About a month later, Investigator learned from First Detective that Crutcher wished to speak with him. Investigator and a detective from the Sanpete County Sheriff's Office (Sanpete County Detective) then met with Crutcher over the course of two days. At the beginning of the first of these meetings, Investigator advised Crutcher of his *Miranda* rights and provided a form for Crutcher to sign indicating that he waived those rights, which

---

2. Crutcher was housed in the Dogwood housing unit throughout the course of the investigation, but it appears he was moved to other cells within Dogwood as a matter of course and based on regular day-to-day assessments of inmate behavior. It is not clear from the record whether Crutcher was housed alone for the entirety of his time in Dogwood.

Crutcher signed.[3] Crutcher then told Investigator and Sanpete County Detective that on the day of the incident, he had simply woken up and found Cellmate dead from what he assumed to be suicide and called for officers to respond. Not fully convinced by Crutcher's recounting of the event in light of the condition in which Cellmate was found, Investigator ended the interview by communicating as much to Crutcher, and he said that they would be back to talk with him.

¶5    The next day, Investigator returned, again accompanied by Sanpete County Detective, to speak with Crutcher. During this encounter, Crutcher gave Investigator a handwritten letter, telling them verbally and in writing that he had "not been honest" with them the day before and that instead of waking up to find Cellmate dead, he had watched Cellmate hang himself. Crutcher admitted that he had lied about what happened in the first place out of fear of punishment for watching Cellmate commit suicide and failing to call for help. Again, Investigator communicated to Crutcher that he was not "completely sold on even this version of the story."

¶6    Later that summer, on July 24, another CUCF detective (Second Detective) informed Investigator that Crutcher had a sealed letter that he wished to have delivered to the county attorney. Second Detective had been speaking with Crutcher regarding an unrelated matter when, at the end of the interview, Crutcher handed Second Detective an envelope, telling him "that he wanted it to go to the prosecutor" and that it was regarding

---

3. With the exception of his first encounter with investigators when Crutcher invoked his *Miranda* rights and chose not to speak with Investigator and First Detective, the record shows that each time a member of law enforcement interacted with Crutcher thereafter, Crutcher was advised of his rights, was asked if he wished to waive those rights, and affirmatively waived those rights. There is no assertion from Crutcher to the contrary.

"what happened in Hickory." Hearing this, Second Detective reiterated that his involvement with Crutcher was focused on the unrelated incident and not on the circumstances of Cellmate's death. But Crutcher "persisted" in his request that Second Detective "take the letter to the prosecutor." Second Detective then delivered the envelope to Investigator.

¶7 After taking possession of the envelope, Investigator attempted to deliver it to the county attorney the next day, July 25. But the envelope containing the letter was not addressed to the county attorney, having only the words "Steven Crutcher, legal material" written on it, so before accepting the letter, the county attorney requested that Investigator ensure Crutcher was aware he was prosecuting "a case in which [Crutcher was] a suspect" and that Crutcher indeed wanted the county attorney to have the letter. Investigator then returned the still-sealed envelope to Second Detective with the instruction to have Crutcher address it appropriately if he wanted it delivered to the county attorney. Second Detective spoke with Crutcher again on that same day, during which time Crutcher addressed the envelope to the county attorney, and the letter was again conveyed to the county attorney. Investigator and the county attorney then read the following in Crutcher's letter:[4]

---

4. We note that, while the following language is extremely offensive, throughout this opinion we quote the language Crutcher used because it provides necessary context for his belated claim that his confessions were coerced. *Cf. United States v. Porter*, 928 F.3d 947, 951 n.2 (10th Cir. 2019) ("We avoid inclusion of obscenities, racial slurs, and other offensive language in our opinions unless the word or phrase is central to our analysis and is a quotation from one of the parties.").

I Steven Crutcher started planning how to kill that Cuban nigger the second day I was his cellie he is nothing but a stupid fucking nigger thats what was going through my head I am a wood[5] white pride all the way 100% white power It's time to stand up and be proud killing that nigger earned me my ᛋᛋ bolts[6] I killed that Cuban nigger and after I killed him I hung him in the back of the cell like the nigger he is . . . so yeah I choked that nigger out with some thin braided rope out of blanket entil he passed out then held the presser entil I knew that nigger was dead

The whole time while choking this nigger out I was saying in his ear white power mother fucker over and over entil he passed out then I spit on that fucking nigger after I knew he was dead I hung that nigger in the back of the cell yeah white power

---

5. "Wood" is short for "peckerwood." "In the second half of the 20th century, in prison environments in Texas, California, and possibly elsewhere, the word peckerwood, originally used to refer to White prisoners generally, began to develop a more specific association with members of racist prison gangs and cliques . . . ." *Peckerwood*, Anti-Defamation League, https://www.adl.org/resources/hate-symbol/peckerwood [https://perma.cc/TT8Z-KJG6].

6. "ᛋᛋ bolts," also known as "SS bolts," "are a common white supremacist/neo-Nazi symbol derived from Schutzstaffel (SS) of Nazi Germany," which "maintained the police state of Nazi Germany. . . . Following World War II, the SS bolts symbol was adopted by white supremacists and neo-Nazis worldwide." *SS Bolts*, Anti-Defamation League, https://www.adl.org/resources/hate-symbol/ss-bolts [https://perma.cc/9RWF-Z8HB].

mother fuckers time to make a stand and be proud
of taken that niggers life

my full confession:

Steven Crutcher ᚺᚺ

¶8     After reading the letter, Investigator returned to the prison that same day to speak with Crutcher regarding the letter's contents. Investigator was accompanied by the then-sheriff of Sanpete County. Investigator asked Crutcher, "Do you want to go over with me a little bit of what you wrote in that letter and why you wrote the letter?" In reply to questions posed by Investigator, Crutcher explained:

I went back to my old skinhead ways, you know.
That's what I am, that's what I'm proud to be, you
know.

. . . .

I don't live by these laws and I don't follow these
laws of the land, you know.

. . . .

I do my own thing. I follow the Aryan teachings
laws.

. . . .

You know. I just wanted to express, you know—
proud for who I am, just standing up and be proud
of what I am now.

. . . .

I let it be known in that letter.

. . . .

It's all true, you know.

Investigator then asked whether Crutcher had been bribed or coerced into writing the letter, and Crutcher denied any outside influence.

¶9     Crutcher also detailed his planning, preparation, execution, and attempted cover-up of the murder of Cellmate. Crutcher stated he decided to carry out the act the "second the guy became my cellie." Crutcher detailed his process in making various ropes out of braided bedding material, stating, "I made a couple different things just figuring out how to strangle his ass." Crutcher also narrated how he "instigated" a scuffle between himself and Cellmate "to get an adrenaline rush," and then

I just pushed his ass against the wall and wrapped [the rope] around his neck and started choking him. He started screaming.

. . . .

I just fucking pulled like that as tight as I could around his neck . . . to stop him from screaming . . . . [He was] trying to fight but I just—I kept him pushed up against the wall, and he just passed out.

¶10    Crutcher explained that after Cellmate was dead, he moved him to his bed, placed blankets over him to avoid raising suspicion with prison guards when they did their rounds, and then he "sat there watching a movie with a smile on my face" until after breakfast rounds were completed. Crutcher explained how he later proceeded to stage Cellmate's body and belongings to make it look "[l]ike he hung himself."

¶11 After this recounting of the incident, Investigator asked, "This murder . . . was just basically a racial thing, a hate thing?" Crutcher responded, "Just hate, yeah. If he would have been white, I probably would have never done it. . . . [A]ctually I guarantee I would have never done it." Finally, Investigator repeated his inquiry about whether Crutcher had been promised anything or been threatened by anyone to "come clean now," and Crutcher told him, "No. It was all on my own. . . . I murdered that dude."

¶12 Investigator visited Crutcher again, on July 26, and informed him of the county attorney's intention of entering the letter into evidence. He also conveyed the county attorney's desire to know that the letter was indeed penned by him. Crutcher confirmed that he wrote the letter, that he addressed the letter's envelope to the county attorney, and that no one forced him to write the letter or asked him to write the letter. He signed a statement of fact indicating as much. During that conversation, Crutcher stated he "killed that mother fucker because he's a fucking stupid Cuban nigger." Investigator asked, yet again, if the contents of the letter were genuine, to which Crutcher responded, "Everything in that letter is true."

¶13 That was not the end of Crutcher's unsolicited communications. Crutcher sent two more letters to the county attorney in the following months, postmarked September 6 and October 15. In the September 6 letter, Crutcher stated: "I sent you my full confession last month. . . . Are you guys going to file charges or not? . . . I'm guilty. I just want to plead guilty and get this over with as soon as possible." In the October 15 letter, Crutcher stated that he had "no regrets for taken that Cuban nigger's life. . . . I killed that nigger straight out of hate for his kind. And believe me if I have a chance to take another niggers life I will not hesitate white power ⅃卐," and he again signed "Steven Crutcher �55." On October 23, Investigator met with Crutcher

again, both letters in hand, and Crutcher again signed a statement indicating that he wrote these later letters of his own free will and confirmed that no one else had a role in the matter.

¶14    In November 2013, the State filed a charge of first-degree aggravated murder against Crutcher, later indicating its intent to seek the death penalty. Counsel was then appointed to represent Crutcher.

¶15    In March 2015, Crutcher filed a motion to suppress his confession and the statements that he made to investigators, claiming, among other things, that he made those statements involuntarily. Specifically, Crutcher argued that under the totality of the circumstances, his statements were involuntary based on his lack of formal education, his mental health issues, and his housing situation at the time of the discussions with investigators. The district court denied Crutcher's motion on the ground that it could "find no causal connection" between the change in housing and Crutcher's decision to confess, noting specifically that Crutcher had not produced any evidence to show that he was placed in the Dogwood housing unit to elicit his confession. Crutcher sought interlocutory review of the court's decision, which the Utah Supreme Court denied. Shortly thereafter, Crutcher and the State reached a plea agreement.

¶16    On May 2, 2016, the district court held a change-of-plea hearing, during which it conducted a thorough rule 11 colloquy with Crutcher to ascertain his state of mind, to establish his knowledge of the rights he was waiving by proceeding with a *Sery* plea,[7] and to determine if Crutcher was entering into the plea

---

7. As has been codified for many years in rule 11(j) of the Utah Rules of Criminal Procedure, "[a] *Sery* plea is a conditional plea in which a defendant pleads guilty . . . but reserves the right to appeal the trial court's denial of a motion to suppress certain
(continued…)

agreement voluntarily. When asked whether he had been threatened or coerced into pleading guilty, Crutcher answered, "No," and when asked whether he was pleading guilty of his own volition, he replied, "Yes, I am." In accepting the plea, the court specifically noted that it did so based on Crutcher's responses during the rule 11 colloquy, Crutcher's indication that he understood the factual basis for his charged crime that had been provided to the court, and the sufficiency of the evidence the State had previously proffered to establish the factual basis for the guilty plea. It was anticipated that a penalty-phase jury trial would be held in January 2017.

*Post-Plea Communications and Proceedings*

¶17    Twenty-nine days after his guilty plea was entered, the district court received a pro se letter from Crutcher claiming that his confession to Cellmate's murder was coerced because a white supremacist group had told him to falsely confess to the murder or else they would kill him and his family. Crutcher further claimed that "before all this happened I had nothing in my file that I represented white supremace or affliated with any white supremacy group." Finally, Crutcher requested that his retraction not go "public" otherwise he would be "a dead man." Crutcher's letter did not identify any specific individuals who allegedly made the threats or indicate when and where these threats were made.

¶18    After a telephonic conference on August 17, 2016, the court set an initial hearing for September 2 to question Crutcher about

---

evidence." *Kamoe v. Ridge*, 2021 UT 5, ¶ 23, 483 P.3d 720. "If the appellate court reverses the denial of that motion, the defendant's plea is withdrawn." *Id. See State v. Sery*, 758 P.2d 935, 939 (Utah App. 1988). This particular *Sery* plea provided that Crutcher could appeal the court's denial of the motion to suppress his statements, particularly in regard to their alleged involuntariness.

the letter. At the hearing, Counsel represented that he needed more time to talk to Crutcher, and another evidentiary hearing was set for later that month. On September 29, the day before the rescheduled hearing was to take place, Counsel again informed the court that he needed more time to talk to Crutcher, and the court continued the evidentiary hearing to October 26. Following the rescheduling, the court indicated in a minute entry that if a motion to withdraw Crutcher's letter was not filed prior to the October 26 hearing, the court would construe the letter to be a motion to withdraw Crutcher's plea, and the parties would need to be prepared to present evidence supporting or opposing the motion at the next hearing. The court further indicated that Crutcher and the State "should plan on a substantive resolution of the issues surrounding the ex parte letter at the upcoming hearing." The court also stated that it had given Counsel ample "time to discuss the ex parte letter" with Crutcher, and that unless there was a compelling reason to continue the next hearing, it would not grant another continuance, noting that the "matter need[s] to be resolved expeditiously in order to determine the nature of the [pentalty-phase] trial pending in January." Due to a family emergency for Counsel, the evidentiary hearing was then reset to November 23, and as no motion to withdraw Crutcher's letter had been filed, the letter was thereafter construed by the court as a motion to withdraw Crutcher's guilty plea.

¶19 During the hearing on November 23, Counsel communicated to the court that Crutcher's demeanor was "markedly different from the last time" Counsel had seen him and that Crutcher had told Counsel he had been "abruptly" denied one of his medications. Counsel then requested that another hearing be set to allow him time to flesh out Crutcher's allegations regarding the medication. The court indicated that it had already continued the matter several times and stressed the need for

expeditious resolution of the issues.[8] The court then scheduled a telephone conference on November 29 and a tentative evidentiary hearing on December 2.

¶20    Come November 29, Counsel filed a motion for leave to withdraw as counsel, stating that he would violate several rules of professional conduct if required to disclose information that would be useful in determining the validity of Crutcher's plea. Counsel expressed a concern about the State's inevitable intention to call him as a witness regarding the communications surrounding Crutcher's guilty plea and the requested withdrawal of that plea. Counsel also requested that, in the event the court denied the motion to withdraw, the court "appoint independent counsel free from these conflicts" to litigate the motion to withdraw the plea.

¶21    During the telephonic conference that same day, the court communicated to the parties that it would not permit the State to call Counsel as a witness because any communications between Counsel and Crutcher were protected by attorney–client privilege. The court then noted the several opportunities that the

8. Scheduling a trial of this nature in Sanpete County was logistically complicated, or so we gather from the record, and the next available jury trial date would be at least nine months out if the scheduled penalty-phase trial did not go forward in January as planned. For example, cognizant of the agricultural dynamic prevalent in the county and the possible agricultural involvement of potential jurors, the court and parties considered the reality that scheduling a jury trial during certain times of the year (namely spring and fall) would put a strain on potential jurors and also possibly eliminate a large number of potential jurors. Another concern was the small size of the county and that in scheduling and sending out questionnaires, and then rescheduling and resending out new questionnaires, a potential "pollution" of the jury pool could occur.

court had offered Crutcher to show cause as to why his plea should be withdrawn. None of those opportunities had been utilized, and instead several hearings had been continued as requested by Counsel for various reasons, culminating in Crutcher's allegedly deteriorated state at the November 23 hearing. The court concluded that Crutcher had effectively "waived any request for an oral argument or evidentiary hearing on the motion [to withdraw the guilty plea]."

¶22   Due to the timing and preparation needed for the penalty-phase jury trial scheduled for January, the court then set an accelerated briefing schedule, requesting that the parties present their arguments regarding Crutcher's motion to withdraw the plea and Counsel's motion for leave to withdraw. At that juncture, Counsel explained that he was "over an unethical barrel" in having to litigate Crutcher's motion. In response to this, the court indicated that Counsel could file a "memorandum addressing his ethical concerns and any privileged information in a sealed filing that the court could view in camera." No objections were raised to either course of action proposed by the court. The court then addressed the claim that Crutcher's medication had been stopped, allegedly leading to his mental deterioration. The State reported that after investigation into this claim, it discovered that Crutcher had not been prescribed that specific medication for almost three years prior to the November 23 hearing. Counsel also explained that any concerns he had about Crutcher in that regard had been alleviated.

¶23   Following the telephonic conference, the State filed objections to both Crutcher's motion to withdraw his plea and Counsel's motion to withdraw, and Counsel filed corresponding replies. Counsel did not, however, file a sealed memorandum regarding his ethical conundrum, but again repeated his request that independent counsel be appointed to assist Crutcher in litigating the motion to withdraw his plea.

¶24 With no sealed memorandum filed by Counsel addressing the ethical concerns about litigating the motion to withdraw the plea, and with no further explanation or evidence supporting Crutcher's claims in his motion to withdraw his plea, the court denied both motions. In its order, the court highlighted that it had scheduled five different hearings to discuss Crutcher's letter, four of which were evidentiary hearings and all of which had been unfruitful. The court noted that during the November 23 hearing, Crutcher "fabricated circumstances in order to *avoid* having the evidentiary hearing" by claiming to have been denied medication abruptly and behaving in such a manner as to cause Counsel concern. The court further explained that Crutcher offered no evidence in his "self-serving" letter, or at any other time for that matter, that would provide the court with any basis on which to conclude that his claims of coercion were substantiated, especially "after representing in open court" his freedom from coercion. The court specifically noted that Crutcher's "general allegations of threats from white supremacists" lacked names of those who issued threats and that Crutcher's retraction letter "lacks the evidentiary weight necessary to overcome his conduct at his change of plea hearing and his representations to the court" that his guilty plea was the result of his "own free will and choice." Additionally, the court explained that Crutcher's credibility had been undermined through the "gamesmanship he engaged in by fabricating withdrawal symptoms" from a medication he had not been prescribed in almost three years, in an effort to avoid the evidentiary hearing.

¶25 In one last attempt to allow Crutcher to explain his position, the court noted that it might "reconsider its ruling denying [Crutcher's] motion to withdraw his guilty plea" in conjunction with the decision to not set a "fifth evidentiary hearing" if, and only if, Crutcher "provide[d] the court with an offer of proof." Such an offer would include "what evidence he would present at a hearing if granted another opportunity,"

including witness names and summaries of what testimony those witnesses would give, as well as a summary of Crutcher's own testimony. Despite being given this one last opportunity, Crutcher provided nothing to the court. Crutcher's guilty plea remained in place, and he was later sentenced to life without the possibility of parole.[9] Crutcher now appeals.

ISSUES AND STANDARDS OF REVIEW

¶26   Crutcher first argues that the district court erroneously denied his motion to suppress statements he made during the investigation. "We review a district court's ultimate determination of the voluntariness of a confession for correctness. But we defer to the court's underlying factual findings unless they are clearly erroneous." *State v. Glasscock*, 2014 UT App 221, ¶ 10, 336 P.3d 46 (quotation simplified), *cert. denied*, 343 P.3d 708 (Utah 2015). "A trial court's factual findings are clearly erroneous only if they are against the clear weight of the evidence, or if we otherwise reach a definite and firm conviction that a mistake has been made." *State v. Apodaca*, 2018 UT App 131, ¶ 31, 428 P.3d 99 (quotation simplified), *aff'd*, 2019 UT 54, 448 P.3d 1255.

---

9. Though beyond the scope of this appeal, an event occurred that cannot go unnoted. In advance of the scheduled penalty-phase trial, it was discovered that the Department of Corrections had failed to provide over 1,500 pages of Crutcher's medical file to Counsel for use in preparing Crutcher's defense, despite his requests and the district court's orders. After this discovery, the State withdrew the death penalty from consideration and recommended that Crutcher receive a life sentence instead—a recommendation to which Crutcher stipulated. The district court's expressed frustration with this turn of events is entirely understandable.

¶27   Next, Crutcher argues that the district court erroneously denied Counsel's motion to withdraw as counsel and Counsel's alternative request that the court appoint independent counsel to assist Crutcher in litigating his motion to withdraw his guilty plea. "A trial court's ruling on a motion to withdraw is discretionary, but the court abuses its discretion if its denial of the motion violates the defendant's constitutional right to counsel." *State v. Williams*, 2013 UT App 101, ¶ 8, 300 P.3d 788, *cert. denied*, 312 P.3d 619 (Utah 2013). *See also State v. Alvarez-Delvalle*, 2012 UT App 96, ¶ 2, 275 P.3d 279 ("We review whether the trial court's refusal to appoint substitute counsel violated [a defendant's] Sixth Amendment right for correctness."), *cert. denied*, 285 P.3d 1229 (Utah 2012).

¶28   Crutcher also contends that the district court erred in denying his motion to withdraw his guilty plea without first holding an evidentiary hearing to address the validity of Crutcher's claims. "We review a trial court's decision to rule on a motion to withdraw a guilty plea without first holding an evidentiary hearing for an abuse of discretion." *State v. Walker*, 2013 UT App 198, ¶ 9, 308 P.3d 573.

¶29   Finally, Crutcher claims that, due to his guilty plea and the limitations under Utah law regarding plea withdrawals, he has forgone the ability to raise several other claims, such as ineffective assistance of counsel or discovery violations, thereby violating "a number of fundamental state and federal constitutional rights." In his reply brief, Crutcher's argument in this regard is distilled to a request that, as there are cases addressing this specific issue currently before the Utah Supreme Court, this court should "consider staying this appeal pending the Utah Supreme Court's determination of what procedural avenue" will be established for

similarly situated individuals.[10] Because Crutcher's request for a stay appears for the first time in his reply brief, we do not address this issue further.[11] *See Allen v. Friel*, 2008 UT 56, ¶ 8, 194 P.3d 903 ("It is well settled that issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court.") (quotation simplified).[12]

---

10. Crutcher points to *State v. Rippey*, Appellate Case No. 20200917-SC, and indicates that a number of other cases are stayed pending the decision in *Rippey*.

11. To his credit, Crutcher correctly acknowledges that because of the current state of the law, we are indeed prevented from addressing claims raised in this final argument. We are bound by our jurisprudence as it currently exists and, even if this request had been raised in a timely fashion, under the law we do not have the jurisdiction to consider these issues. *See State v. Badikyan*, 2020 UT 3, ¶ 15, 459 P.3d 967 (affirming the "court of appeals' conclusion that the Plea Withdrawal Statute bars appellate review of all unpreserved claims, even those made on appeal of timely motions to withdraw"). *See also State v. Sundara*, 2021 UT App 85, ¶ 60, 498 P.3d 443 ("[T]his court lacks the authority to overrule Utah Supreme Court precedent."), *cert. denied*, 502 P.3d 271 (Utah 2021).

12. Additionally, at the end of his opening brief, Crutcher requests that if we do not remand on the above-argued issues, we should order that independent counsel be appointed to assist Crutcher "in filing a post-conviction petition if he so chooses." That request is not within our prerogative to grant because under Utah Code section 78B-9-109, which authorizes the appointment of counsel to assist with post-conviction proceedings, "the ultimate decision about whether to appoint counsel rests with the district court."

(continued…)

ANALYSIS

I. Motion to Suppress

¶30 The first issue before this court is whether the district court incorrectly denied Crutcher's motion to suppress the statements he made during the course of the investigation. Abandoning his story about coercion by white supremacists, Crutcher now argues that his statements were involuntarily made as a result of being moved to a housing unit with fewer privileges and being placed in solitary confinement following Cellmate's death. Crutcher claims that the housing conditions he experienced in the Dogwood housing unit during the time he was conversing with investigators were "highly psychologically coercive" and "punitive" and that it was only after being subject to these conditions that he initiated contact with the county attorney. In response, the State argues that the district court expressly found "no causal connection between Crutcher's new prison accommodations and his later confessions" that would suggest that Crutcher's statements were the product of coercion. We agree with the State that the evidence supports the district court's conclusion that Crutcher's statements were voluntary.

¶31 "The due process clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution protect individuals from being compelled to incriminate themselves." *State v. Glasscock*, 2014 UT App 221, ¶ 15, 336 P.3d 46 (quotation simplified), *cert. denied*, 343 P.3d 708 (Utah 2015). "For a court to find that a confession is involuntary, evidence to support that finding must reveal some physical or psychological force or manipulation that is designed to induce the accused to talk when he otherwise would not have done so." *State v. Werner*, 2003 UT App 268, ¶ 15, 76 P.3d 204 (quotation simplified). In other words, "the ultimate

---

*Zaragoza v. State*, 2017 UT App 215, ¶ 19, 407 P.3d 1122, *cert. denied*, 417 P.3d 579 (Utah 2018).

goal of analyzing whether a confession was coerced and therefore involuntary is to determine whether, considering the totality of the circumstances, the free will of the witness was overborne." *State v. Apodaca*, 2019 UT 54, ¶ 28, 448 P.3d 1255 (quotation simplified). A totality-of-the-circumstances analysis includes consideration of "both the characteristics of the accused and the details of the interrogation." *State v. Rettenberger*, 1999 UT 80, ¶ 14, 984 P.2d 1009 (quotation simplified). Even if the evidence does reveal that there was force designed to induce statements, "there must also be a causal relationship between the coercion and the subsequent confession." *Werner*, 2003 UT App 268, ¶ 15 (quotation simplified).

¶32 Crutcher's argument is wholly unpersuasive given the totality of the circumstances surrounding his statements and confession. Put simply, the act of moving Crutcher from his original cell to a new cell in the prison, even with the change in privileges and the lack of a cellmate, was not in and of itself coercive. In fact, it appears that quite the opposite was true here, for several reasons.

¶33 First and foremost, there were the letters. The contents of the July 24 letter and the events that occurred leading up to the letter making its way to the county attorney are particularly damning and stand in stark contrast to Crutcher's coercion claims. Crutcher has not presented any evidence to suggest, nor is there any evidence in the record that might indicate, that he was forced to write to the county attorney confessing to Cellmate's murder or to continue discussing the incident further with investigators. On the contrary, the record demonstrates that he wrote the letter of his own volition, when quite alone, intentionally brought that letter to an interview in an unrelated matter, and willingly handed it to Second Detective, who otherwise had no awareness of its existence. Even after being assured that Second Detective was not there to discuss the circumstances surrounding Cellmate's death, Crutcher still insisted that Second Detective deliver the letter to

the county attorney. At any point during that conversation, Crutcher could have decided to forgo mentioning—let alone delivering—the letter. But he did not. Then, when the letter was later returned to Crutcher unopened for the purposes of adding an addressee to the envelope and confirming his intention for the county attorney to receive the letter, he again opted to have it delivered. He did so even with an intervening period of some twenty-four hours, during which time he could have evaluated the letter and the advisability of transmitting it. Crutcher could have halted the process he began then and there, but he continued to forge ahead, sending the two additional letters claiming responsibility for Cellmate's death, unequivocally and unremorsefully explaining why and how he murdered Cellmate.

¶34    Next, Crutcher's behavior during his interactions with law enforcement exhibited anything but the effects of coercion. Second Detective and Investigator both testified at a 2015 evidentiary hearing that during their meetings with Crutcher, he was calm, clear, and reasoned. The court also heard testimony from Second Detective that Crutcher was upset at the prospect that he might be getting a cellmate, further weakening Crutcher's contention that the solitary nature of the housing unit was causing him psychological strain sufficient to prompt him to confess to a murder he did not commit.

¶35    Also relevant to our consideration of the totality of the circumstances is the fact that Crutcher was familiar with the judicial system, as he was already incarcerated at the time of Cellmate's murder and told Investigator that he had been in prison for fifteen years. Further, Crutcher was made aware of his *Miranda* rights each time Investigator or Second Detective spoke with him and so was fully aware that he could stop communicating with investigators at any time. Indeed, he had done so at the very first meeting with Investigator immediately following the discovery of Cellmate's body.

¶36 The factual context and circumstances discussed thus far do not alone support a conclusion that Crutcher was susceptible to any alleged coercion, and our totality-of-the-circumstances analysis leads us to next consider the landscape of communications among Crutcher, Investigator, and Second Detective.

¶37 From the outset, Investigator and Second Detective conducted their questioning in a constitutionally proper manner. In Investigator's first meeting with Crutcher, Crutcher invoked his *Miranda* rights, after which no one questioned him further until Crutcher requested to speak with Investigator again. During each interaction with Investigator and other detectives after that, Crutcher was read his *Miranda* rights, and he was repeatedly provided opportunities to halt communications. But he did not.

¶38 Notably, nothing in the record indicates that Investigator or Second Detective had to entreat or persuade Crutcher to relay what he did, nor does Crutcher present any evidence of untoward actions or abuse committed by Investigator or Second Detective. In fact, each time investigators spoke with Crutcher about his confession, and in response to simple questions about his involvement, within a matter of minutes Crutcher volunteered why and how he killed Cellmate. Crutcher's statements were devoid of regard for Cellmate or remorse for his actions, and his lack of inhibition serves to further illustrate how freely and comfortably Crutcher was expressing himself both during interviews with Investigator and Second Detective and in his letters.

¶39 In conclusion, the district court correctly concluded that Crutcher presented no evidence of force or coercion and that his actions and statements were voluntary. The court also correctly concluded that Crutcher did not show a connection between his housing situation and his prolific confessions and graphic explanations of his role in Cellmate's death. We therefore see no

error in the district court's conclusions and its denial of Crutcher's motion to suppress his statements.

## II. Counsel's Motion to Withdraw

¶40 The second issue before us requires us to determine whether the district court abused its discretion when it denied Counsel's motion to withdraw and his alternative request that, at the very least, the court appoint independent counsel to represent Crutcher in litigating his motion to withdraw his plea. Crutcher has not persuaded us that the court abused its discretion.

¶41 Crutcher contends that the court's request that Counsel elaborate on his ethical concerns, even in a sealed filing, was inappropriate because it placed a burden on Counsel to potentially violate rules of professional conduct. Further, Crutcher argues that the denial of the request for appointed independent counsel was in error because, for example, there may have been discussions and differing opinions between Counsel and Crutcher about Crutcher's desire to withdraw his plea that "could not be disclosed to the court in the first instance but could have been explored by independent counsel," and denying such an appointment effectively denied Crutcher his right to conflict-free representation. The State argues that the district court correctly denied the motion because Counsel failed to offer any proof that a conflict actually existed, instead offering conclusory statements and references to various rules. The State also highlights that the court had a reasonable interest in moving the case along in an expeditious manner. Again, we agree with the State.

¶42 "An attorney's motion to withdraw as counsel prior to the entry of judgment in a criminal case is subject to the approval of the court." *State v. Wadsworth*, 2012 UT App 175, ¶ 2, 282 P.3d 1037, *cert. denied*, 293 P.3d 376 (Utah 2012). *See also State v. Scales*, 946 P.2d 377, 381 (Utah Ct. App. 1997) ("Whether to allow an

indigent defendant's attorney to withdraw after the attorney has expressed concern about his or her relationship with the defendant is a matter committed to the trial court's sound discretion and will be reversed only for an abuse of discretion."). We have also explained that replacing defendant's counsel is required when a defendant can show "good cause, such as a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict with his or her attorney." *State v. Pursifell*, 746 P.2d 270, 274 (Utah Ct. App. 1987). A defendant's constitutional right to counsel is violated when the defendant is "forced to stand trial with the assistance of an attorney with whom he has become embroiled in an irreconcilable conflict." *Id.* (quotation simplified). Crutcher has not met the required threshold showing of good cause that would require the replacement of Counsel.

¶43　Here, in its denial of Counsel's motion to withdraw, the court highlighted that it had offered Counsel the opportunity to enlighten the court in a confidential filing as to the concerns about continuing to represent Crutcher in the motion to withdraw his plea, a course of action to which Counsel did not object. The court also noted that if it were to allow withdrawal in circumstances where trial counsel asserted they could not continue in representing a client with an unsupported, general statement of "ethically, I cannot continue," it would inevitably create a rule with potential "dangers," including "abuse by defendants seeking to have new counsel appointed or a delay of trial proceedings."

¶44　On appeal, Crutcher has not shown that Counsel's continued representation created a conflict to the extent that Crutcher's constitutional right to counsel was violated. We can make assumptions as to why at that particular juncture Counsel wished to withdraw, and an appreciation of that circumstance is no doubt what prompted the court to suggest that Counsel share his concerns with the court confidentially. But Counsel did not take that opportunity, and Crutcher has not demonstrated on

appeal that this procedure, not objected to below, constituted plain error. *Cf. United States v. Zolin*, 491 U.S. 554, 569, 574 (1989) (explaining that the Supreme Court "has approved the practice of requiring parties who seek to avoid disclosure of documents to make the documents available for *in camera* inspection" and that "*in camera* review may be used to determine whether allegedly privileged attorney-client communications fall within the crime-fraud exception"); *Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, 219 F. Supp. 3d 155, 159 (D.D.C. 2016) ("Numerous courts have reviewed similar affidavits under seal to ascertain the basis of the motion to withdraw without upsetting the attorney-client privilege.") (collecting cases). Accordingly, the district court did not abuse its discretion when it denied Counsel's motion to withdraw.

### III. Crutcher's Motion to Withdraw Guilty Plea

¶45　Finally, Crutcher argues that the district court abused its discretion when it denied his motion to withdraw his guilty plea without first holding an evidentiary hearing. On this final issue, Crutcher does not contest the voluntariness of his guilty plea so much as the fact that there was no evidentiary hearing held to determine the validity of the claim that his plea was not voluntary. Crutcher's argument can be summed up in his contention that "the court should have explored Crutcher's claims rather than refusing to listen unless the defendant complied with onerous conditions that could not be met." We disagree with Crutcher's characterization that the district court refused to listen to him before denying the motion without first holding an evidentiary hearing.

¶46　"It is the responsibility of the district court to ensure that defendants enter pleas knowingly and voluntarily." *State v. Candland*, 2013 UT 55, ¶ 14, 309 P.3d 230. When a defendant moves to withdraw a guilty plea, "an evidentiary hearing must ordinarily be held unless the record of a prior hearing shows

petitioner is clearly not entitled to relief." *Summers v. Cook*, 759 P.2d 341, 345 (Utah Ct. App. 1988). In those instances where the record clearly provides the court with a basis for "factual determinations and credibility assessments," we have concluded that it is not an abuse of the court's discretion to proceed without an evidentiary hearing. *See State v. Walker*, 2013 UT App 198, ¶¶ 48–49, 308 P.3d 573. We have reasoned that the same is true when an appellant fails to provide "additional evidence he would have presented had he been afforded an evidentiary hearing," *id.* ¶ 49, as the responsibility lies with a defendant to show "good cause" as to why a guilty plea should be withdrawn, *see State v. Humphrey*, 2003 UT App 333, ¶ 10, 79 P.3d 960 ("A defendant can show good cause by putting forth evidence that the plea was in fact involuntary.").

¶47   In *Walker*, a defendant appealed the denial of his request for an evidentiary hearing in conjunction with his motion to withdraw his guilty plea. 2013 UT App 198, ¶ 9. Prior to the court's denial, the defendant had provided affidavits from recanting witnesses in support of his motion to withdraw. *Id.* ¶ 7. In concluding an evidentiary hearing was unnecessary, the district court explained, among other things, that the evidence that would have been presented at the hearing would have merely reiterated what was already contained in the affidavits. *Id.* ¶ 47. On appeal, the defendant argued that he was entitled to an evidentiary hearing under *Summers* and *Humphrey*. *Id.* ¶ 48. We determined that the defendant's reliance on those cases was misplaced because the "documentary evidence accomplished the same purpose as would an evidentiary hearing," *id.*, and because the court made that decision in a detailed manner, listing its "factual determinations and credibility assessments" of the defendant and others, *id.*, differentiating that case from the circumstances in *Summers* and *Humphrey*. *See Summers*, 759 P.2d at 345 (establishing the requirement for an evidentiary hearing "unless the record of a prior hearing shows petitioner is clearly

not entitled to relief"); *Humphrey*, 2003 UT App 333, ¶¶ 11, 13 (remanding to the district court due to a lack of "necessary credibility assessment[s] and factual determinations" "to support its ruling on [the defendant's] motion to withdraw his plea"). We noted in *Walker* that the defendant also failed to detail any additional evidence he could have provided other than what was already submitted to the court and concluded that the court did not abuse its discretion in denying the defendant's motion to withdraw without an evidentiary hearing. 2013 UT App 198, ¶ 49.

¶48 While this case is unlike *Walker* given the fact that Crutcher has not provided *any* evidence to support his claim of involuntariness, the reasoning in *Walker* is helpful. Here, like in *Walker*, the district court had sufficient information in the record—specifically the testimony of Second Detective and Investigator about what Crutcher told them and what Investigator saw in his first visit to the crime scene—and from the rule 11 colloquy it conducted, to conclude that Crutcher had affirmatively communicated to the court that he was admitting his guilt of his own free will. Further, and perhaps more importantly in this case, like in *Walker*, Crutcher has not identified "what additional evidence he would have presented had he been afforded an evidentiary hearing," *id.*, and has not "identif[ied] any additional witnesses," *id.*, who would be able to corroborate his coercion claims, even after the court gave Crutcher several specific opportunities to do so.

¶49 This case would be very different if the district court denied an evidentiary hearing at the first request for a continuance, perhaps even at the second. But that is not what happened here. The court scheduled at least five different proceedings to address Crutcher's letter, deemed by the court to be a motion to withdraw his guilty plea, and Crutcher took advantage of none of them. The court reasonably concluded that Crutcher had effectively waived his opportunity to present his case at an evidentiary hearing. This conclusion is further

supported by the fact that, in a final effort to assure that Crutcher had every opportunity to provide supporting evidence, the court allowed him one more bite at the apple, provided that Crutcher could produce any information about witnesses that would support his claims that his confession was the product of threats of harm to himself and others. As previously noted, Crutcher provided nothing.

CONCLUSION

¶50 Crutcher has not demonstrated that the events that occurred following Cellmate's death were intended to put him in a position of vulnerability that would result in him making involuntary incriminating statements. Further, Crutcher has not shown how the denial of Counsel's motion to withdraw and related request for independent counsel constituted an abuse of discretion under all the circumstances. Finally, Crutcher has not shown that the court abused its discretion when it denied his motion to withdraw his guilty plea without first holding an evidentiary hearing. We therefore conclude that the district court appropriately exercised its discretion in denying Crutcher's and Counsel's motions.

¶51 Affirmed.

———————